2008-NMSC-025

184 P.3d 411

**ALBUQUERQUE COMMONS PARTNERSHIP, Petitioner–Petitioner,**

v.

**CITY COUNCIL OF the CITY OF ALBUQUERQUE, Respondent–Respondent.**

**Albuquerque Commons Partnership, Petitioner–Petitioner,**

v.

**City Council of the City of Albuquerque, Respondent–Respondent.**

Nos. 29,791, 29,799.

Supreme Court of New Mexico.

Feb. 18, 2008.

Rehearing Denied May 2, 2008.

Mettler & Lecuyer, P.C., Stephen T. Lecuyer, Philip D. Davis, Timothy V. Flynn–O'Brien, George R. "Pat" Bryan, III, Albuquerque, NM, for Petitioner.

Robert M. White, City Attorney, Mark A. Hirsch, Deputy City Attorney, UNM School of Law, Michael B. Browde, Campbell & Wells, P.A., John S. Campbell, Miller & Stratvert, P.A., Alice Tomlinson Lorenz, Albuquerque, NM, Robinson & Cole, L.L.P., Dwight H. Merriam, Peter S. Olson, Hartford, CT, for Respondent.

Van Amberg, Rogers, Yepa & Abeita, L.L.P., Ronald J. Van Amberg, Santa Fe, NM, Leof T. Strand, Attorney at Law, P.C., Leof T. Strand, Albuquerque, NM, for Amicus Curiae, Volcano Cliffs Property Owners Association.

New Mexico Municipal League, Randall D. Van Vleck, Santa Fe, NM, International Municipal Lawyers Association, Charles W. Thompson, Jr., Devala A. Janardan, Bethesda, MD, for Amici Curiae, New Mexico Municipal League, International Municipal Lawyers Association and The National League of Cities.

Hunt & Davis, P.C., Catherine F. Davis, Julie J. Vargas, Albuquerque, NM, for Amicus Curiae, Greater Albuquerque Chamber of Commerce.

Cassutt, Hays & Friedman, P.A., Kenneth J. Cassutt, Santa Fe, NM, Garvey Schubert & Barer, Carrie A. Richter, Edward J. Sullivan, Portland, OR, for Amici Curiae, American Planning Association and N.M. Chapter of the American Planning Association.

Anita P. Miller, Attorney at Law, P.C., Anita P. Miller, Albuquerque, NM, Noble & Wickersham, L.L.P., Jay Wickersham, Cambridge, MA, for Amicus Curiae, Boston Society of Architects.

## OPINION

BOSSON, Justice.

{1} In *Miller v. City of Albuquerque*, 89 N.M. 503, 554 P.2d 665 (1976), this Court held that when a zoning authority rezones a piece of property to a more restrictive use (known as "downzoning"), the zone change must be justified by either a change in the surrounding community or a mistake in the original zoning. We later reaffirmed this rule in *Davis v. City of Albuquerque*, 98 N.M. 319, 648 P.2d 777 (1982), and applied it to a rezoning pursuant to a sector plan. In this case, the City of Albuquerque adopted a new sector plan that restricted the uses on Petitioner's property. Petitioner argues, and the district court agreed, that, in adopting this sector plan, the City downzoned Petitioner's property without complying with *Miller* and in violation of Petitioner's procedural due process rights. A jury also agreed with Petitioner and awarded damages under 42 U.S.C. § 1983.

{2} The City claims, and the Court of Appeals agreed in reversing the damages award, that *Miller* and *Davis* do not apply to the City's zoning action because (1) the adoption of the sector plan in this case was a legislative act, and (2) the zone change was done pursuant to a text amendment, as opposed to a map amendment, and was therefore not the type of zone change to which *Miller* and *Davis* apply. *See Albuquerque Commons P'ship v. City Council of the City of Albuquerque*, 2006–NMCA–143, 140 N.M. 751, 149 P.3d 67, *cert granted*, 2006–NMCERT–011, 140 N.M. 846, 149 P.3d 943 (*Commons II* ). We now hold that the City's actions did constitute a downzoning of Petitioner's property without complying with important standards set forth in *Miller* and *Davis*, which we reaffirm in this Opinion. Accordingly, we reverse the Court of Appeals and remand for further proceedings.

## BACKGROUND

{3} The facts pertinent to this appeal are set forth thoroughly and comprehensively in the Court of Appeals opinion, and we refer only to those portions of the record that are necessary to resolve this appeal.

{4} From 1987 to 1998, Petitioner Albuquerque Commons Partnership ("ACP") held a long-term ground lease for the old St. Pius High School site in Albuquerque, located north of the Winrock Shopping Center. This property is part of an approximately 460–acre area designated by the City's Comprehensive Plan as the Uptown Sector, one of several urban centers in the city. When ACP leased the 28–acre parcel from the Archdiocese of Santa Fe, the zoning was governed by the 1981 Uptown Sector Plan, under which the majority of the 460 acres, including ACP's property, was zoned SU–3, with the periphery being zoned either SU–2 or R–1. "SU–3 zoning provides suitable sites for high-intensity mixed uses—commercial, office, service, and residential." *Commons II*, 2006–NMCA–143, ¶ 6, 140 N.M. 751, 149 P.3d 67. Important to our later analysis, the 1981 Uptown Sector Plan standards did not mandate minimum development densities, mixed uses, or parking structures, and did not prohibit free-standing buildings, limit the amount of retail use in a development, or require that an entire project be built at once instead of in phases.

{5} From the time the City adopted the 1981 Uptown Sector Plan until it passed the 1995 amendments that are the subject of this suit, the City approved several suburban retail projects within the same area, including a Beall's, a Dillard's addition, a theater, mall expansion, and three new restaurants (all at Winrock), as well as three new restaurants and two new stand-alone retail projects outside Winrock. The City also approved a zone change allowing Toys R Us to demolish office space and replace it with a new stand-alone "medium box" retail building. As we shall see, these projects would not have been allowable under the 1995 Uptown Sector Plan amendments.

{6} In 1991, ACP decided to sell its leasehold, selecting Opus Southwest Corporation ("Opus") to assume development of the property. Opus proposed to either purchase or lease the property if it could obtain approval of its site development plan. In June 1994, Opus submitted a site plan for a stand-alone retail project on ACP's property. This proposal also included a request for a zone map amendment because the site plan included property in the SU–2 zone. Due to strong public opposition, Opus withdrew its proposal on August 31, 1994.

{7} Two weeks after Opus withdrew its first site plan proposal, the City passed Memorial M7–1994, requesting a comprehensive public review and revision of the 1981 Uptown Sector Plan. The City stated its desire to fulfill the vision of the Comprehensive Plan and observed that the 1981 Uptown Sector Plan needed to be revised and strengthened. Thus, the City "requested that the planning department present its 'plan-amendment recommendations and a record of the public review' of the [1981 Uptown Sector Plan] to the City's Environmental Planning Commission (EPC) for consideration by the end of April 1995." *Commons II*, 2006–NMCA–143, ¶ 10, 140 N.M. 751, 149 P.3d 67.

{8} Shortly thereafter, on September 30, 1994, Opus submitted its second site plan, this time proposing a smaller, 17.90–acre low-density "big-box" retail project. This project was to be located entirely within the SU–3 zone and would not require any zone map amendments. *Id.* The Planning Department's initial reports to the EPC on the project stated that the retail uses were allowed by the 1981 Uptown Sector Plan, and proposed consistent EPC findings.

{9} The Opus site plan was originally set for a hearing before the EPC in November 1994, but Opus agreed to a deferral of the hearing until January 1995. EPC then deferred consideration of the site plan until February 9, 1995, due to information that the City was considering a moratorium on development in the Uptown Sector pending revision of the 1981 Uptown Sector Plan. On February 6, 1995, the City Council passed a resolution placing a four-month moratorium on all development within the Uptown Sector.

{10} After instituting the moratorium and deferring consideration of ACP's project, the Planning Department implemented "a fast-track schedule with specific deadlines to prepare information necessary to evaluate proposed revisions to the [1981 Uptown Sector Plan]." *Commons II*, 2006–NMCA–143, ¶ 15,

140 N.M. 751, 149 P.3d 67. The proposed revisions split the existing SU–3 zone into two new sub-zones: the "Intense Core" and the "Outside of Intense Core," separated by the Loop Road. Though the zoning classification remained the same for the entire area, additional regulations applicable only to the Intense Core were significantly more restrictive than those under the 1981 Uptown Sector Plan or in the Outside of Intense Core. The newly-proposed Intense Core regulations prohibited free-standing retail, imposed limitations on the size of retail buildings, and required mixed uses, with retail comprising no more than 10 percent of space built on a site. Additionally, the Intense Core regulations required a specific density of uses, structured parking, and, significantly, construction of an entire project at once, without phasing to match construction demand. In contrast, the Outside of Intense Core regulations allowed retail uses to continue at existing density. Retail was limited to 10 percent of new space, but "redevelopment/replacement of existing space" was exempted.

{11} ACP's leased property was located entirely within the Intense Core zone. Only two other property owners owned land in the Intense Core, and ACP's property made up two-thirds of the affected land. Further, though all three tracts of land were vacant, only ACP had a pending site plan submitted to the City. As a practical matter, therefore, the new regulations affected primarily ACP and its leasehold interest.

{12} A series of public hearings was scheduled before the EPC, the Land Use Planning and Zoning Committee (LUPZ), and the City Council to consider the amendments. The City initially claimed that the purpose of the amendments was to improve air quality. While the EPC agreed that the 1981 Uptown Sector Plan was in need of revision, it recommended against adopting the 1995 Uptown Sector Plan, finding that "the air pollution problem in the Uptown area would not be significantly affected by the land uses advocated." The EPC also observed that testimony from developers indicated that the

Floor Area Ratio minimums and maximums would make development uneconomical. Finally, the EPC found that the proposed amendments to the 1981 Uptown Sector Plan did not meet the requirements for zone changes set forth in the City's Resolution 270–1980, which sets forth policies and criteria that the City must follow when deciding zone change applications. More will be said later about Resolution 270–1980.

{13} The EPC's findings were discussed at a later meeting of the LUPZ. At this hearing, the city attorney stated his opinion that the City did not have to comply with the requirements of Resolution 270–1980 because those requirements only apply to zone map amendments and the 1995 Uptown Sector Plan amendments were text amendments. A planner with the Environmental Health Division challenged the EPC's finding that the amendments would not significantly improve air quality, stating that the finding was based only on selected data and explaining that when all data were used, mixed uses, together with any amount of transportation management strategies, would result in fewer exceedances of the carbon monoxide standards.[1] Three people with experience in the real estate or financial field also testified that the vacant land in the Intense Core could develop under the 1995 Uptown Sector Plan restrictions. At the close of the testimony, one of the councilors stated that the issues underlying EPC's recommendation against adoption of the 1995 Uptown Sector Plan had been significantly addressed, and LUPZ voted to recommend passage of the revised sector plan.

{14} The City Council then held two public hearings on the 1995 Uptown Sector Plan and on June 19, 1995, the Council voted 7–0 in favor of adopting the amended sector plan. In its resolution adopting the 1995 Uptown Sector Plan, the Council recited introductory "whereas" paragraphs that tracked similar paragraphs in the Council's memorial directing the 1981 Uptown Sector Plan's revision. These broad statements did not address the specific criteria that apply to rezonings, as

---

1. Though this testimony indicates that air quality would be improved with mixed uses combined with transportation management strategies, the district court found that no traffic demand management measures were included in the 1995 Uptown Sector Plan.

will be discussed later in this Opinion. Pursuant to the City's adoption of the 1995 Uptown Sector Plan, the EPC voted to defer consideration of Opus' site plan indefinitely because it did not comply with the revised sector plan.

{15} In July 1995, ACP sought district court review under NMSA 1978, Section 3–21–9 (1965), of the City's decision to adopt the 1995 Uptown Sector Plan. That petition was subsequently amended to add claims under § 1983 for damages allegedly caused by the City's denial of ACP's rights to substantive and procedural due process in the adoption of the 1995 Uptown Sector Plan, for inverse condemnation under state law, and for an unconstitutional taking in violation of the Fifth Amendment. The district court found that the 1995 Uptown Sector Plan amendments downzoned ACP's property and that the City had not complied with applicable state law, as well as its own policies and procedures under Resolution 270–1980, in enacting the new sector plan. Therefore, the court held that the new restrictions in the 1995 Uptown Sector Plan were invalid as applied to ACP and remanded the case to the City for consideration of Opus' site plan under the 1981 Uptown Sector Plan. The court also found that ACP suffered a deprivation of its right to procedural due process, and thus allowed ACP to go forward with its § 1983 damages claim as well as its federal takings claim. The court dismissed the state takings claim along with the § 1983 claim based on substantive due process, ruling that the decision to adopt the 1995 Uptown Sector Plan was not arbitrary and capricious.

{16} While the damages claims proceeded in the district court, ACP requested that the City Council conduct a hearing on the Opus site plan under the 1981 Uptown Sector Plan, pursuant to the district court's ruling in the first administrative appeal. The EPC denied approval of the plan, and in March 2000, the City Council affirmed the EPC's decision and denied approval under the 1981 Uptown Sector Plan.

{17} ACP then sought review of the City Council's ruling in a second administrative appeal to the district court pursuant to NMSA 1978, Section 39–3–1.1 (1998). The district court reversed the City Council's decision denying approval of the site plan under the 1981 Uptown Sector Plan and ordered the City Council to approve the site plan. The City sought an immediate appeal of the district court's ruling in the second administrative appeal to the Court of Appeals, but on October 3, 2002, the Court of Appeals ruled that the order was non-final and not appealable because "ACP's claim for damages for the violation of procedural due process claim [sic][was] still pending." *Albuquerque Commons P'ship v. City of Albuquerque*, 2003–NMCA–022, ¶ 11, 133 N.M. 226, 62 P.3d 317 (Ct.App.2002) (*Commons I* ).

{18} In February 2003, ACP's federal procedural due process and takings claims were tried to a jury. "The jury was instructed that the law of the case was that ACP's property had been downzoned and that ACP was entitled to a quasi-judicial hearing before the property was downzoned." *Commons II*, 2006–NMCA–143, ¶ 28, 140 N.M. 751, 149 P.3d 67. The jury returned a verdict in favor of ACP on both claims. The verdict for damages for the takings claim was dismissed pursuant to the election of remedies doctrine, and on April 11, 2003, the district court entered final judgment against the City on the due process verdict in the amount of $8,349,095.00.

{19} The City then sought certiorari review of both district court administrative reviews in the Court of Appeals, and also appealed from the district court judgment on the jury verdict. *Commons II*, 2006–NMCA–143, ¶ 29, 140 N.M. 751, 149 P.3d 67. The Court of Appeals granted the petitions seeking review of the two administrative appeals and consolidated all three appeals. *Id.*

{20} The Court of Appeals overturned all three district court decisions. With regard to the first administrative appeal, the Court of Appeals reversed the district court, and held that the 1995 Uptown Sector Plan amendments were legislative text amendments that did not downzone ACP's property, did not need to satisfy the standards of *Miller* and *Davis*, and were therefore valid as applied to ACP. *Id.* ¶¶ 39, 67. Because the other two decisions—the order requiring the City to approve the site plan under the

1981 Uptown Sector Plan and the § 1983 verdict—were based on the district court's initial conclusion with regard to the 1995 Uptown Sector Plan, the Court of Appeals reversed those decisions as well. *Id.* ¶ 78. We granted certiorari to address issues relating to procedural fairness in the passage of the 1995 Uptown Sector Plan amendments and, in particular, the continued applicability of our precedent in *Miller* and *Davis*.

## DISCUSSION

### First Administrative Appeal

{21} We begin with the first administrative appeal challenging the City's adoption of the 1995 Uptown Sector Plan and its application of the amended sector plan to ACP's proposed project. The Court of Appeals viewed the "pivotal" issue in this matter to be whether the City's action in adopting the 1995 Uptown Sector Plan was legislative or quasi-judicial in nature. *See Commons II,* 2006–NMCA–143, ¶ 33, 140 N.M. 751, 149 P.3d 67. Finding that the City's action was legislative, the Court of Appeals went on to determine that the City followed proper procedures in adopting the 1995 Uptown Sector Plan, and that there was no downzoning of ACP's property to which the rules pertinent to such actions would apply. *See id.* ¶ 78.

{22} Instead of evaluating the nature of the City's action as quasi-judicial or legislative, we begin with whether the City's adoption of the 1995 Uptown Sector Plan Intense Core restrictions effected a downzoning of ACP's property. We view this to be the critical inquiry because its outcome will determine what processes the City was required to employ, what it was required to show, and how much discretion it had in making its decision. The effect of the City's action on the property owner—whether it constitutes a downzoning or not—determines the degree of process due, not the label the City employs. The City acknowledges that it did not follow quasi-judicial procedures and did not attempt to satisfy the criteria for a downzoning; it simply denies that a downzoning took place. Thus, if the 1995 Uptown Sector Plan did not downzone ACP's property, there was nothing wrong with the City's adoption of that sector plan by a legislative rather than a quasi-judicial process. On the other hand, if the 1995 Uptown Sector Plan amendments did effect a downzoning of ACP's property, then those amendments will be invalid as applied to ACP because they were not justified according to the applicable standards, or passed pursuant to quasi-judicial procedures designed to safeguard the affected property owner's due process rights.

{23} We therefore begin by examining New Mexico's law on rezoning and the standards and procedures that apply to rezoning actions. We then address the City's arguments as to why those standards and procedures do not apply to the adoption of the 1995 Uptown Sector Plan amendments. In doing so, our focus is not on how the City characterized its zoning action and what procedures it used, but on what kind of action the City *in fact* took, and what procedural protections are required to accompany such actions.

### New Mexico Law on Rezoning: Downzoning and the *Miller* Rule

{24} New Mexico courts use the term "downzoning" to describe rezoning to a more restrictive use. *See KOB–TV, L.L.C. v. City of Albuquerque,* 2005–NMCA–049, ¶ 27, 137 N.M. 388, 111 P.3d 708 ("*KOB* ") (citing *Davis,* 98 N.M. at 320–21, 648 P.2d at 778–79, for the proposition that "downzoning consists of the rezoning of a property to a more restrictive use"). The term as it has been employed by our courts is essentially a term of art that implies a rezoning action instituted by someone other than the landowner—most often the municipality itself—that is directed at a single parcel or a small number of parcels within a larger zone area, and that expands the restrictions on the use of the property. *See Commons II,* 2006–NMCA–143, ¶ 68, 140 N.M. 751, 149 P.3d 67 ("'Downzoning' is an informal word of art that almost never appears in the statutes or ordinances."); *see also Davis,* 98 N.M. at 321, 648 P.2d at 779 (noting that *Miller* involved a downzoning when the landowner's property was rezoned to a more restrictive use upon the City's initiative); 3 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* ("Ziegler") § 38:13, at 38–10 to –11 (2005) (noting that "downzonings are

seldom initiated by the rezoned property owner, rather, they usually occur at the behest of neighbors or community groups, or at the initiative of the local government itself"). Such a targeted rezoning action is also called a "piecemeal rezoning" and stands in contrast to a "comprehensive rezoning," which "affect[s] a substantial portion of land within the zoning jurisdiction belonging to many landowners." Ziegler § 38:14, at 38–12; *see also KOB*, 2005–NMCA–049, ¶ 27, 137 N.M. 388, 111 P.3d 708 (recognizing no downzoning when rezoning involved amendments that applied city-wide); *Turner v. Bd. of County Supervisors of Prince William County*, 263 Va. 283, 559 S.E.2d 683, 685 (2002) (court found that ordinance was "piecemeal downzoning" because it was initiated by the county board, it selectively targeted certain property, and it reduced the potential density of the property owners' land below that recommended by the county's master plan).

{25} New Mexico courts have often used the term "downzoning" as shorthand for those actions that require justification pursuant to the "change or mistake" rule and the zoning authority's own regulations for zoning amendments, which in this case are contained in the City's Resolution 270–1980. The "change or mistake" rule, adopted by this Court in *Miller* and reaffirmed in *Davis*, dictates that the proponent of a zoning change, in this instance the City, must show that such a change is justified due to either a change in conditions in the community or a mistake in the original zoning. *Miller*, 89 N.M. at 506, 554 P.2d at 668 ("The fundamental justification for an amendatory or repealing zoning ordinance is a change of conditions . . . necessary to protect the public interest [or to] cover and perfect previous defective ordinances or correct mistakes or injustices therein." (Quoted authority omitted.)); *see also Davis*, 98 N.M. at 321, 648 P.2d at 779 (declining to overrule *Miller* and rejecting City's argument that the change or mistake rule should not apply to rezonings accomplished pursuant to amendments to a sector plan). The rule evidences a concern over the stability of zoning regulations and a

landowner's right to rely on existing zoning rules. *See Miller*, 89 N.M. at 506, 554 P.2d at 668 (noting that the change or mistake rule supports the "desirable stability of zoning classifications upon which the property owner has a right to rely, since property may be purchased and sold or uses of the property undertaken in reliance on existing classifications"). As we acknowledged in *Miller*, while a property owner does not have a vested right in a particular zoning classification, before a piecemeal zoning change is implemented, due consideration must be given to whether such a change is justified, particularly when the zoning authority and not the landowner seeks to rezone a piece of property. *Id.*

{26} New Mexico courts have not limited the *Miller* rule's applicability to piecemeal rezonings of single parcels, but have extended it to downzonings done pursuant to a comprehensive plan, and even to an upzoning of a specific property upon petition of the landowner.[2] *See, e.g., Davis*, 98 N.M. at 321, 648 P.2d at 779 (noting that the fact that the downzoning in that case was done pursuant to a comprehensive plan did not, in itself, distinguish that case from *Miller*); *W. Old Town Neighborhood Ass'n v. City of Albuquerque*, 1996–NMCA–107, ¶¶ 17–18, 122 N.M. 495, 927 P.2d 529 (holding that an amendment to a sector plan rezoned landowner's property to a less restrictive use, and thus the City had to justify the change in accordance with the *Miller* rule and the City's Resolution 270–1980), *superceded by statute as stated in C.F.T. Dev., LLC v. Bd. of County Comm'rs of Torrance County*, 2001–NMCA–069, ¶ 14, 130 N.M. 775, 32 P.3d 784. The characteristic common to those zoning actions which we have held must be justified by a change or mistake appears to be that they have focused on specific properties or small groups of properties within an otherwise similarly situated class, restricting or allowing uses in ways that do not apply to the surrounding area or similar areas within the city.

{27} To illustrate, in *Davis* we held that a downzoning of an eight-block area pursuant

---

2. An upzoning is a zoning action that rezones a parcel to a less restrictive use. Such zoning actions are usually favored by landowners as they give greater flexibility in the use of property.

to a sector plan amendment was subject to the change or mistake rule. 98 N.M. at 321–22, 648 P.2d at 779–80. Our decision was informed by evidence that the eight blocks appeared to have been singled out from the rest of the sector plan, being severely downzoned while the other areas within the sector plan were allowed to continue at substantially the same density and with the same types of structures. *Id.* Similarly, in *W. Old Town,* 1996–NMCA–107, ¶ 21, 122 N.M. 495, 927 P.2d 529, our Court of Appeals held that the *Miller* rule applied to the City's approval of an upzoning of a landowner's property when the City "attempted to limit the effect of the rezoning to [that] property alone as a unique situation."

{28} Also applicable to zoning amendments are the City's own rules and policies set forth in Resolution 270–1980. *See W. Old Town,* 1996–NMCA–107, ¶ 18, 122 N.M. 495, 927 P.2d 529. This provision is quoted in its entirety in the Court of Appeals opinion. *See Commons II,* 2006–NMCA–143, ¶ 64, 140 N.M. 751, 149 P.3d 67. Resolution 270–1980 tracks the change or mistake rule, requiring that the proponent of the zoning change "demonstrate that the existing zoning is inappropriate because (1) there was an error when the existing zone map pattern was created, or (2) changed neighborhood or community conditions justify the change." *Commons II,* 2006–NMCA–143, ¶ 64, 140 N.M. 751, 149 P.3d 67. The Resolution also recognizes an additional criterion that can justify a zoning amendment, stating that the proponent of the change may show that "a different use category is more advantageous to the community, as articulated in the Comprehensive Plan or other City master plan, even though (1) or (2) above do not apply." *Id.*

{29} The relationship between the *Miller* rule and Resolution 270–1980 is unclear; *Miller* and *Davis* appear to speak only in terms of change or mistake as the exclusive criteria upon which a zoning amendment may be based. However, upon closer reading, both cases suggest that a demonstration of a change in the community or a mistake in the original zoning are not the only valid justifications for a zoning change. *Miller* expresses a primary concern over "the desirable stability of zoning classifications upon which the property owner has a right to rely, since property may be purchased and sold." 89 N.M. at 506, 554 P.2d at 668. The change or mistake criteria are referred to as "principles and considerations [that] must be taken into account, particularly when the zoning change of a piece of property is sought by the zoning authority instead of by the owner of the property affected." *Id.* Thus, change or mistake were not envisioned as strict, all-encompassing requirements, without which a zoning change will never be justified. Similarly, in *Davis,* we recognized that "a more reasonable downzone or a more reasonable comprehensive plan might be sufficient to remove the case from the *Miller* requirements of 'mistake or change.'" 98 N.M. at 321, 648 P.2d at 779. Thus, the third criterion in Resolution 270–1980 is not necessarily incompatible with the principles set forth in *Miller* and *Davis.*

 {30} The enhanced procedures that are required to accompany proposed zoning changes directed at a small number of properties constitute the primary protection for the landowner. Rigid application of the *Miller* rule to those proposed changes is therefore unnecessary and can unduly impede the zoning authority's ability to make zoning decisions that are ultimately beneficial to the community at large. Resolution 270–1980 adequately accommodates the need for planning and zoning flexibility. Therefore, without adopting any absolute standards or mechanical tests, we recognize that a municipality may be able to justify an amendment that downzones a particular property by demonstrating that the change is "more advantageous to the community, as articulated in the Comprehensive Plan or other City master plan." Resolution 270–1980; *accord Commons II,* 2006–NMCA–143, ¶ 64, 140 N.M. 751, 149 P.3d 67. The proof in such a case would have to show, at a minimum, that "(1) there is a public need for a change of the kind in question, and (2) that need will be best served by changing the classification of the particular piece of property in question as compared with other available property." *Fasano v. Bd. of County Comm'rs of Washington County,* 264 Or. 574, 507 P.2d 23, 28 (1973), *superceded by*

*statute as stated in Menges v. Bd. of County Comm'rs of Jackson County,* 44 Or.App. 603, 606 P.2d 681 (1980) (en banc).

## Quasi–Judicial Versus Legislative Zoning Decisions

■ {31} The essence of ACP's challenge to the 1995 Uptown Sector Plan Intense Core restrictions is that ACP's property was singled out for a downzoning and the City failed to follow the proper procedures or comply with the requisite criteria in adopting those amendments. The nature of a particular zoning action as either legislative or quasi-judicial is determinative of the procedures that the zoning authority is required to follow in implementing that action. *See Hart v. City of Albuquerque,* 1999–NMCA–043, ¶ 13, 126 N.M. 753, 975 P.2d 366 ("Zoning decisions can be either legislative or quasi-judicial depending upon the impact of the zoning change."); Ziegler § 40:22, at 40–49 (noting that characterization of a rezoning as quasi-judicial can result in the parties being entitled to greater procedural rights and enabling reviewing courts to conduct a closer scrutiny of the merits of the rezoning decision). We note that while we use the labels "legislative" and "quasi-judicial" for the sake of convenience, the real question here is whether the City's adoption of the 1995 Uptown Sector Plan amendments was fair overall, affording ACP adequate due process of law. *See Hacker v. Baesler,* 812 S.W.2d 706, 709 (Ky.1991) ("Much argument has been offered as to whether [a zoning map] amendment process ought to be labeled legislative, judicial, [or] quasi-judicial. [T]he ultimate question is, considering the nature, subject, and purpose of the proceeding and the constitutional rights of the participants, how much process of law is due?"); *Ed Zaagman, Inc. v. City of Kentwood,* 406 Mich. 137, 277 N.W.2d 475, 499 n. 33 (1979) (Levin, J., for affirmance and remand) (cautioning that discussion of the labels "legislative" and "quasi-judicial" "should not be emphasized to the point of distraction from the underlying concepts [because t]he issue is one of procedural fairness and predictability that is adaptable to local conditions and capabilities" (quoted authority omitted)), *overruled on other*

grounds by *Schwartz v. City of Flint,* 426 Mich. 295, 395 N.W.2d 678, 679 (1986).

■ {32} The Court of Appeals aptly explained the differences between legislative and quasi-judicial actions as follows:

[L]egislative action reflects public policy relating to matters of a permanent or general character, is not usually restricted to identifiable persons or groups, and is usually prospective; quasi-judicial action, on the other hand, generally involves a determination of the rights, duties, or obligations of specific individuals on the basis of the application of currently existing legal standards or policy considerations of past or present facts developed at a hearing conducted for the purpose of resolving the particular interest in question.

*Commons II,* 2006–NMCA–143, ¶ 36, 140 N.M. 751, 149 P.3d 67. Small-scale zone changes to which the *Miller* rule and Resolution 270–1980 apply are necessarily quasi-judicial, not legislative, in nature. As we noted earlier, the term "downzoning" is used to indicate a rezoning directed at a small number of properties, newly restricting the uses of those properties in ways that are not applicable to the surrounding area. Such restrictions are limited to identifiable properties and are not general policy decisions that apply broadly. Further, because such changes must be justified pursuant to the *Miller* rule and Resolution 270–1980 (or a similar local policy), they require specific factual findings relating to the affected properties. *See Strawberry Hill 4 Wheelers v. Bd. of Comm'rs for Benton County,* 287 Or. 591, 601 P.2d 769, 775–76 (1979) (en banc) (noting that where pre-existing criteria guide the result, quasi-judicial proceedings are necessary to elicit the determinative facts). These qualities are the hallmarks of a quasi-judicial action.

■ {33} Characterization of a zoning action as quasi-judicial carries with it important procedural consequences. Thus, when a zoning authority initiates a proposal to downzone a particular property, the zoning authority must afford enhanced procedural protections to landowners whose properties are the subject of the zone change. *See* Ziegler § 40:22, at 40–49 (noting that characteriza-

tion of a rezoning as quasi-judicial can result in the parties being entitled to greater procedural rights and enabling reviewing courts to conduct a closer scrutiny of the merits of the rezoning decision). Quasi-judicial zoning matters are not politics-as-usual as far as the municipal governing body is concerned. In such proceedings, the council does not sit as a mini-legislature, as it functions in most matters, but instead must act like a judicial body bound by "ethical standards comparable to those that govern a court in performing the same function." *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 119 N.M. 29, 40, 888 P.2d 475, 486 (Ct.App.1994).

{34} Therefore, in addition to the right to individual notice, interested parties in a quasi-judicial zoning matter "are entitled to an opportunity to be heard, to an opportunity to present and rebut evidence, to a tribunal which is impartial in the matter— i.e., having had no pre-hearing or ex parte contacts concerning the question at issue— and to a record made and adequate findings executed." *Fasano*, 507 P.2d at 30. The burden is on the proponent of the zone change to establish that the change is justified. *See South of Sunnyside Neighborhood League v. Bd. of Comm'rs of Clackamas County*, 280 Or. 3, 569 P.2d 1063, 1071 (1977) (en banc). While the specific procedures employed "must adhere to fundamental principles of justice and procedural due process," they are not required to comport with the same evidentiary and procedural standards applicable to a court of law. *W. Bluff Neighborhood Ass'n*, 2002–NMCA–075, ¶ 46, 132 N.M. 433, 50 P.3d 182, *overruled on other grounds by Rio Grande Chapter of Sierra Club*, 2003–NMSC–005, 133 N.M. 97, 61 P.3d 806. The issue is one of procedural fairness and predictability that is adaptable to local conditions and capabilities. The use of terms such as cross-examination, fair and impartial tribunal, and the like, need not be interpreted in the same sense as it might be in an attempt to reform the judicial process. *Ed Zaagman, Inc.*, 277 N.W.2d at 499 n. 33 (Levin, J., for affirmance and remand). In New Mexico, justification for small-scale zone changes is governed by the criteria set forth in *Miller* and in the municipality's own policies and procedures, which in this case are contained in Resolution 270–1980.

{35} Regardless of the justification, the decision-making body should provide "a clear statement of what, specifically, [it] believes, after hearing and considering all the evidence, to be the relevant and important facts upon which its decision is based," and a full explanation of why those facts lead it to the decision it makes. *South of Sunnyside Neighborhood League*, 569 P.2d at 1076. This is critical for facilitating meaningful judicial review of the action, "not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the [zoning authority] to demonstrate that it has applied the criteria prescribed by . . . its own regulations and has not acted arbitrarily or on an ad hoc basis." *Id.; see Smith v. Bd. of County Comm'rs of Bernalillo County*, 2005–NMSC–012, ¶¶ 32–33, 137 N.M. 280, 110 P.3d 496 (reversing County's denial of a radio tower permit upon finding that, in denying the permit after having initially granted it, officials went against their original interpretation of the relevant ordinance and acted on an ad hoc basis).

### The City's Arguments

{36} In a conscious decision, the City chose not to follow the procedural standards that attach to a quasi-judicial downzoning. Instead, on advice of counsel, the City adopted the 1995 Uptown Sector Plan amendments in the form of a legislative proceeding, thereby limiting evidence, preventing cross-examination, and making no effort to provide ACP with an impartial tribunal by limiting *ex parte* contacts on the part of the council members.[3] Apart from the broad

---

3. As an example of the legislative-type lobbying that accompanied the passage of the 1995 Uptown Sector Plan amendments, Ron Nelson, President of the Uptown Association, called Councilor Vicki Perea after she had proposed amendments to the 1995 Uptown Sector Plan that would have eased the impact on ACP. Mr. Nelson encouraged Councilor Perea not to make amendments that would allow the Opus Plan to proceed and stated his belief that if she worked at it, Councilor Perea could get the four votes needed to pass the amendments favored by the Uptown Association. Councilor Perea then withdrew her proposed amendments. Such contacts

and conclusory "whereas" points set forth in the ordinance adopting the 1995 Uptown Sector Plan, the City made no findings at all, let alone any specific findings of fact and explanation of how those facts justified the amendments under the *Miller* and Resolution 270–1980 criteria.

{37} However, the City argues, and the Court of Appeals agreed, that the 1995 Uptown Sector Plan Intense Core restrictions were valid because neither quasi-judicial procedures nor justification pursuant to *Miller* and Resolution 270–1980 were required in this case. With regard to the procedures used, the City contends that adoption of the 1995 Uptown Sector Plan was a legislative act, and therefore did not require any enhanced procedural protections for the affected landowners. As to the applicability of *Miller* and Resolution 270–1980, the City claims that those rules do not apply to rezonings accomplished by text amendments. This brings us to the crux of the case and to the decisive points where we disagree with the City and the Court of Appeals. We address each argument in turn.

### Adoption of the 1995 Uptown Sector Plan Intense Core Restrictions Was Not a Legislative Act

{38} The Court of Appeals determined that adoption of the 1995 Uptown Sector Plan was a legislative act, reasoning that the City's decision was drawn to apply in the same way, both currently and in the future, to all similarly situated properties, and was "premised on a desire to clarify and strengthen the [1981 Uptown Sector Plan]." *Commons II*, 2006–NMCA–143, ¶ 39, 140 N.M. 751, 149 P.3d 67. In support of its holding, the Court of Appeals analogized this case to one of its earlier opinions. *See KOB*, 2005–NMCA–049, ¶¶ 37–39, 137 N.M. 388, 111 P.3d 708. In *KOB*, 2005–NMCA–049, ¶ 8, 137 N.M. 388, 111 P.3d 708, the City of Albuquerque adopted an ordinance that disallowed helipads in SU–2/O–1 zones, restricting helipads to SU–1 zones only, with exceptions for law enforcement and hospitals.

KOB had obtained a permit and constructed a helipad for its television station under the formerly allowed uses for SU–2/O–1 zones. KOB argued that the ordinance downzoned its property, and thus the City was required to justify the new restrictions in accordance with the *Miller* rule. *Id.* ¶ 27. The Court of Appeals held that the City's adoption of the ordinance was legislative in nature because it established policy for the entire city, such that all SU–2/O–1 zones were subject to the same restrictions: no more helipads were to be allowed. *Id.* ¶ 23. Even though the ordinance had a practical effect on only two landowners by virtue of the fact that only two landowners within the affected zones had helipads, the restrictions were comprehensive in that they applied city-wide. Accordingly, the Court of Appeals upheld the new restrictions as a legislative act to which *Miller* did not apply.

{39} Relying on *KOB*, the Court of Appeals correctly observed that a downzoning does not necessarily occur, requiring quasi-judicial process, simply because only a small number of properties are impacted by the decision or "a particular parcel is in the mind of the zoning authority when it takes action." *Commons II*, 2006–NMCA–143, ¶¶ 37–39, 140 N.M. 751, 149 P.3d 67. That statement is true as far as it goes, although the narrower the focus of the zoning action, the more likely it is that *Miller* will be implicated. By the same token, the fact that policy decisions are involved does not necessarily mean that a zoning action does not effect a downzoning. "Large-scale decisions of specific applicability frequently, if not inevitably, require of the decision-maker both the creation and the application of policy." *Neuberger v. City of Portland*, 288 Or. 155, 603 P.2d 771, 776 (1979). Nor is a rezoning, that applies to more than a single parcel, necessarily legislative. *See South of Sunnyside Neighborhood League*, 569 P.2d at 1071 n. 5 (emphasizing that, by using the terms "single tract" and "single parcel," the court did not intend to adopt a test for determining when a given land-use decision was quasi-

---

and influence are common and appropriate in the normal legislative functioning of a city council. However, when a council sits in a quasi-judicial capacity, as it must to effect a downzoning, its members must be insulated from such contact.

judicial or legislative). When a zoning action is *specifically designed* to affect a relatively small number of properties *and* does not apply to similarly situated properties in the surrounding area or city-wide, that action is quasi-judicial, not legislative.

{40} This case involves restrictions of a different nature than those addressed in *KOB*. The 1995 Uptown Sector Plan Intense Core restrictions, did not apply city-wide, or to the other five urban centers in the city, or even throughout the Uptown SU–3 area. Rather, the restrictions were confined to only a small portion of the Uptown sector, comprising about six percent of the total area and affecting only three landowners, by far the largest being ACP. Had the restrictions applied to all SU–3 zones in the city, or even had they applied throughout the Uptown SU–3 sector, then *KOB* might be of some precedential assistance. But, given that the restrictions were limited to three parcels comprising only six percent of the Uptown sector, the Court of Appeals' reliance on *KOB* is misplaced.[4]

{41} Further, it appears that the 1995 Uptown Sector Plan amendments were not simply designed "to clarify and strengthen the [1981 Uptown Sector Plan]," as the Court of Appeals held. *Commons II*, 2006–NMCA–143, ¶ 39, 140 N.M. 751, 149 P.3d 67. The plain language of the 1981 Uptown Sector Plan, the City's own construction of the 1981 Uptown Sector Plan, and prior City approvals under that plan treated *all* of the SU–3 zone in Uptown as a "suburban commercial" center with shopping centers and restaurants that could be built "to virtually any intensity." Indeed, as stated earlier, an initial staff report on the second site plan submitted by Opus acknowledged that "the

zoning on this site plan allows the proposed retail uses." Moreover, the amendments, by not placing limitations on retail uses for redevelopment or replacement of existing developments, were tailored to affect only ACP—the only property owner in the Uptown sector with a pending site plan—while exempting existing businesses.

{42} We are not persuaded by the City's assertion that the 1995 Uptown Sector Plan amendments merely made explicit what was already implicit in the 1981 Uptown Sector Plan. The very fact that the City postponed a decision on ACP's proposal while it rushed the sector plan amendments through a legislative process leads to a fair inference that the 1995 Uptown Sector Plan was meant to *change* the former sector plan, not simply clarify it. It is difficult to see why, if the City could have denied ACP's permit under the 1981 Uptown Sector Plan, it did not do so at the outset. Instead, the City felt it necessary to stall consideration of ACP's permit and hastily amend the original sector plan.[5]

{43} Regardless of how the City tries to construe its actions, substantial evidence at trial showed that the 1995 Uptown Sector Plan Intense Core restrictions were directed specifically towards ACP and were not public policy matters of a general character. Those changes amounted to a downzoning of ACP's property and required justification based on the specific, fact-based criteria set forth in *Miller* and Resolution 270–1980. *W. Old Town*, 1996–NMCA–107, ¶ 16, 122 N.M. 495, 927 P.2d 529 ("The procedures for amending a sector plan are ... the same as those for amending a zoning map."). Thus, the City's adoption of the 1995 Uptown Sector Plan was the type of zoning action that New Mexico courts, as well as courts from other juris-

---

4. Because this case is demonstrably different from *KOB*, we need not inquire as to whether *KOB* correctly interprets and distinguishes *Miller* and *Davis*. We do note that this Court never had the opportunity to review that decision because KOB, the losing party on appeal, never sought a writ of certiorari.

5. We observe that the City had ample opportunity prior to the submission of the Opus site plan to amend the Uptown Sector Plan. Indeed, the City had been in the process of reviewing the 1981 Uptown Sector Plan and developing draft revisions since 1989. The draft revisions submitted

prior to ACP's submission of its site plan did not create a new Intense Core zone with heavier restrictions than the surrounding area, and did not restrict stand-alone retail projects, set mixed-use or density requirements, require structured parking, or prohibit phased construction to match demand. These initial draft revisions thus lend further support to the argument that the amendments proposed subsequent to ACP's site-plan, and ultimately passed by the City, were specifically designed to prevent ACP's proposed project.

dictions, have traditionally viewed as quasi-judicial in nature primarily because of the disparate impact on only a small number of landowners. *See, e.g., W. Old Town,* 1996–NMCA–107, ¶ 11, 122 N.M. 495, 927 P.2d 529; *McPherson Landfill, Inc. v. Bd. of County Comm'rs of Shawnee County,* 274 Kan.. 303, 49 P.3d 522, 524 (2002) ("[W]here the focus of the zoning authority shifts from the entire city or county to one specific tract of land for which a zoning change is urged, the function of the zoning authority becomes more quasi-judicial in nature than legislative."); *South of Sunnyside Neighborhood League,* 569 P.2d at 1071 ("[T]he decision to amend the comprehensive plan as it applies to [a] single parcel of land is a quasi-judicial, rather than a legislative, decision."); *Fleming v. City of Tacoma,* 81 Wash.2d 292, 502 P.2d 327, 331 (1972) (en banc) ("[I]n amending a zoning code, or reclassifying land thereunder, [a municipal legislative body], in effect, makes an adjudication between the rights sought by the proponents and those claimed by the opponents of the zoning change."), *overruled on other grounds by Raynes v. City of Leavenworth,* 118 Wash.2d 237, 821 P.2d 1204, 1208–09 (1992).

**Rezoning By Text Amendment Versus Map Amendment**

{44} The City presents an alternate argument for not following *Miller* and the Resolution 270–1980 criteria, premised on a purported distinction between zoning text amendments and zoning map amendments. Specifically, the City argues that "the adoption of the [1995 Uptown Sector Plan] *was not a rezoning* of ACP's property but was a text amendment to the zoning code, which strengthened the existing regulations in order to assure development of an urban center, as already required by the [1981 Uptown Sector Plan] and Comprehensive Plan." *Commons II,* 2006–NMCA–143, ¶ 40, 140 N.M. 751, 149 P.3d 67 (emphasis added). The Court of Appeals found the distinction between a zoning text amendment and a zoning map amendment persuasive. We are somewhat skeptical.

{45} In analyzing this argument, the Court of Appeals correctly observed that zoning map amendments "involve[ ] the zoning district reclassification of a particular tract of land by alteration of the official zoning map," while zoning text amendments "do not affect the zoning district classification, but rather change the allowed or permitted uses within a particular zoning district." *Id.* ¶ 42. Thus, "[z]oning text amendments do not affect the zoning district classification, but rather change the allowed or permitted uses within a particular zoning district." *Id.* Relying on two New Mexico Court of Appeals cases, the Court of Appeals found this distinction pivotal, reasoning that "the general term 'rezoning' seems to refer to a zone reclassification by map amendment," but not by text amendment. *Id.* ¶ 44. In other words, the known consequences of a zoning map amendment in terms of *Miller* and Resolution 270–1980 do not apply if the amendment is of the text but not the map. We now turn to an analysis of those two opinions.

{46} In *Mandel v. City of Santa Fe,* 119 N.M. 685, 686, 894 P.2d 1041, 1042 (Ct.App. 1995), the City of Santa Fe amended the text of the zoning code to permit the Historic Design Review Board to limit the height of structures within certain historic districts to lesser heights than that allowed by the underlying zoning. Pursuant to this text amendment, the Review Board denied Mandel's proposed construction project based on the existence of inappropriate second-story structures, and the City affirmed the denial. *Id.* at 687, 894 P.2d at 1043. Mandel claimed that the application of the height amendment to his property was an unlawful downzoning. *Id.* While the Court of Appeals "accept[ed] the notion that the allowable use of [Mandel's] property [had] been restricted," it nevertheless held that Mandel's property had not been downzoned. *Id.* at 688, 894 P.2d at 1044. The Court reasoned that "there was no rezoning that affected only Mandel's property or even Mandel's neighborhood. Rather, the City adopted a height restriction that could be generally applied to all properties in historic districts in the City." *Id.* at 689, 894 P.2d at 1045.

{47} As it did when deciding whether the City's action was legislative or quasi-judicial,

the Court of Appeals again looked to *KOB* in its analysis of zoning text amendments. *See Commons II,* 2006–NMCA–143, ¶¶ 44–46, 140 N.M. 751, 149 P.3d 67. As noted previously, in *KOB,* the City of Albuquerque adopted an ordinance that disallowed helipads in SU–2/O–1 zones, restricting them to SU–1 zones with exceptions for law enforcement and hospitals. These changes were made pursuant to text amendments to the zoning code. The *KOB* court, relying in part on *Mandel,* held that because the ordinance established policy for the entire city such that all SU–2/O–1 zones were subject to the same restrictions, the City's actions did not amount to a downzoning requiring a showing of change or mistake.

{48} While it is true that both *KOB* and *Mandel* involved text amendments that were held not to have downzoned the complaining landowner's property, those decisions did not turn on the amendments being to the text as opposed to the map. Rather, it was because the amendments were not site-specific that there was no downzoning to which the *Miller* rule would apply. As we have discussed, the City's amendments to the Uptown Sector Plan were very much site-specific, and it is this fact that fundamentally distinguishes *KOB* and *Mandel* from the present controversy.

{49} While the restrictions on ACP's property were accomplished by text amendment, that is where the similarity to *Mandel* and *KOB* ends. We agree instead with the district court that the 1995 Uptown Sector Plan Intense Core restrictions effectively created a new sub-zone within the Uptown Sector, regardless of whether such rezoning was accomplished by text amendment or map amendment. The only factor distinguishing this case from *Davis* is that the amendment in *Davis* was to the zoning map, not to the text. As we have indicated, that distinction is not dispositive; a bright-line rule that distinguishes between text amendments and map amendments such that the former can never constitute a rezoning would be a classic elevation of form over substance. We hold that the Intense Core restrictions implemented by the 1995 Uptown Sector Plan rezoned ACP's property to a more restrictive use, an

action for which our courts have historically required justification by a showing of change in the community or mistake in the original zoning.

{50} For the same reasons, we reject the City's argument and the Court of Appeals' holding that Resolution 270–1980 does not apply in this case. While it is true that Resolution 270–1980 refers only to zone map changes and not text changes, the practical effect of the 1995 Uptown Sector Plan was a map amendment, despite the labels used by the City.

{51} In this case, the City accomplished in practical effect through text amendment what would normally be done by map amendment. Indeed, in the 1995 Uptown Sector Plan, the Intense Core and the Outside of Intense Core are each labeled as a "zone." The 1995 Uptown Sector Plan Intense Core restrictions singled out a small section of the Uptown Sector and downzoned that area, requiring the City, as the proponent of the zone change, to justify that change in accordance with the criteria set forth in *Miller* and Resolution 270–1980. The City did not do so. "The City may not ignore or revise its stated policies and procedures for a single decision, no matter how well-intentioned the goal may be." *W. Old Town,* 1996–NMCA–107, ¶ 26, 122 N.M. 495, 927 P.2d 529.

{52} The City has failed to show that the adoption of 1995 Uptown Sector Plan amendments was legislative in nature, or that because the amendments were text amendments they did not rezone ACP's property. There is no legitimate justification for the City's failure to afford the proper procedural protections or comply with the standards set forth in *Miller* and Resolution 270–1980. We hold that the City's decision lacked procedural fairness and did not comport with due process of law.

### The Second Administrative Appeal and ACP's § 1983 Damages Claim

{53} As described earlier, on remand from the first administrative appeal, the City denied ACP's site plan under the 1981 Uptown Sector Plan, and ACP appealed to the district court. On the second appeal, Judge Lang found that the City had not considered

the site plan as previously ordered by Judge Conway on the first appeal. Judge Lang then found that the site plan complied with the 1981 Uptown Sector Plan and ordered the City to approve the plan. The City appealed this ruling to the Court of Appeals, which held that the ruling was not a final order because the § 1983 damages claim was still pending in the district court. In the consolidated appeal below, the City again argued that the district court lacked the power to order the City to approve ACP's site plan. Because the Court of Appeals found the 1995 Uptown Sector Plan valid, contrary to the district court, the Court of Appeals did not have to reach the merits of the City's position that Judge Lang did not have the authority to order the City to approve the Opus site plan under the 1981 Uptown Sector Plan.

{54} We also do not reach that issue because it is now moot. The Archdiocese of Santa Fe sold ACP's site, and a new development was approved and built by another developer under later revisions to the 1995 Uptown Sector Plan which allowed the increased retail use and phased construction that was denied to ACP. Therefore, the only remaining issues involve ACP's § 1983 damages action and its takings claim.

{55} With regard to the § 1983 damages action, the City argued in the Court of Appeals that ACP had no constitutionally protected property interest, and therefore did not satisfy the threshold requirement for a § 1983 claim. ACP countered that because § 1983 property interests are defined by state and not federal law, New Mexico recognizes a property owner's right to be free from unjustified downzonings directed at his

property, as indicated in *Miller* and *Davis*. *See also Smith*, 2005–NMSC–012, ¶ 33, 137 N.M. 280, 110 P.3d 496 ("[Landowners] have a right to use their property as they see fit, within the law, unless restricted by regulations that are clear, fair, and apply equally to all.").[6]

{56} The City also argued that ACP, even if it had a protected property interest, was only entitled to nominal damages because it failed to show that if the City had implemented a fair process and followed the *Miller* and Resolution 270–1980 requirements, the amendments would not have been passed in any event.[7] ACP claimed that this issue had been argued and submitted to the jury, and that the jury's verdict demonstrated that ACP proved its entitlement to compensatory damages. These arguments were not addressed by the Court of Appeals based on its decision regarding the first administrative appeal. Because we reverse that decision, we remand the case to the Court of Appeals to consider the City's remaining issues argued on appeal in light of our analysis on the first administrative appeal and our discussion of *Miller* and Resolution 270–1980.

{57} With regard to the takings claim, the Court of Appeals observed that ACP's experts, who testified that the 1995 Uptown Sector Plan prevented any type of economically feasible development of the property, did not take into account the effect of the 1981 Uptown Sector Plan on the site plan. The Court of Appeals then stated that the effect of its opinion was "to uphold the City's denial of the site plan under the [1981 Uptown Sector Plan]." *Commons II*, 2006–NMCA–143, ¶ 87, 140 N.M. 751, 149 P.3d 67.

6. Other jurisdictions recognize a protected property interest when a landowner has taken substantial steps in reliance on an existing zoning classification. *See, e.g., Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 897(6th Cir.1991) (landowner who had taken substantial steps in reliance on the existing zoning classification and representations by the city that his planned development was permitted by that zoning had property interest in the old zoning classification within which his development was permitted).

7. We note that federal case law appears to allocate this burden differently. Thus, when a § 1983 plaintiff successfully proves a violation of

procedural due process that results in a deprivation of a protected property interest, it is the *defendant's* (the City's) burden to prove that the same results would have been obtained, even if the plaintiff's due process rights had not been violated. *See, e.g., Gomes v. Wood*, 451 F.3d 1122, 1131 (10th Cir.2006) (stating that "when a procedural due process violation occurs and adverse action results, damages for injuries caused by the adverse action may not be recovered if the *defendant* can prove the action *would have* been taken even absent the violation" (citing *Carey v. Piphus*, 435 U.S. 247, 260, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (emphasis added))).

Thus, the Court of Appeals reasoned that these expert opinions could not form the basis for the damages awarded by the jury on ACP's takings claim. Having so held, the Court of Appeals concluded that, "[s]ince ACP's proposed development could not have been built under the [1981 Uptown Sector Plan], no damages could have resulted from similar prohibitions under the [1995 Uptown Sector Plan], and ACP therefore failed in its burden to prove that the [1995 Uptown Sector Plan] effected an unconstitutional taking caused by the denial of all economically viable use of the property." *Id.*

{58} We disagree with the Court of Appeals that the site plan was not approvable under the 1981 Uptown Sector Plan. As we have observed, the very fact that the City rushed to enact the 1995 Uptown Sector Plan amendments before it considered ACP's proposed site plan—a plan which the planning department had already deemed to be in compliance with the 1981 Uptown Sector Plan—undermines the City's position that it could have denied that proposed plan under the 1981 Uptown Sector Plan. Further, the discretion that the City possesses to deny site plans that are otherwise in compliance with existing zoning regulations is limited by the requirement that the City's decision pass muster under judicial review for administrative actions that are arbitrary and capricious or otherwise contrary to law. Existing zoning regulations and sector plans would mean little if the City had limitless discretion to deny proposed developments that were otherwise in compliance with those requirements. *See Smith*, 2005–NMSC–012, ¶ 33, 137 N.M. 280, 110 P.3d 496 ("Ad hoc, standard-less regulation that depends on no more than a zoning official's discretion would seriously erode basic freedoms that inure to every property owner.").

{59} The record shows that the Opus site plan, though it needed some adjustments (adjustments that were in the process of being made at the time the City imposed the moratorium to consider the 1995 Uptown Sector Plan amendments), complied with the re-

quirements of the 1981 Uptown Sector Plan and was no different from a number of projects that the City had previously allowed under that sector plan. *See Smith*, 2005–NMSC–012, ¶ 30, 137 N.M. 280, 110 P.3d 496 ("Courts generally show little deference to an agency's interpretation of its own statute when the interpretation is an unexplained reversal of a previous interpretation or consistent practice." (Quoted authority omitted.)); *High Ridge Hinkle Joint Venture*, 119 N.M. at 41, 888 P.2d at 487 (noting that the City Council "should not be permitted to achieve retroactivity through the back door by changing the meaning of an ordinance while leaving the language the same"). Because our Opinion has now eliminated the basis for the Court of Appeals' reversal of ACP's takings claim, we remand the takings claim for the Court of Appeals to consider the other arguments raised by the City with respect to that claim.[8]

**CONCLUSION**

{60} We reverse the Court of Appeals on the first administrative appeal and affirm the district court on that matter. The case is remanded to the Court of Appeals to consider the City's remaining claims of error.

{61} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA and PETRA JIMENEZ MAES, Justices, and PAUL KENNEDY, J. Pro–Tem.

---

**8.** Of course, if the Court of Appeals finds for ACP on its § 1983 action and affirms the jury's award of damages on that claim, there will be no need to address the takings issue, as the takings verdict was an alternative to the due process verdict.