**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2021-NMCA-029**

**Filing Date: December 23, 2020**

**Nos. A-1-CA-36979 and A-1-CA-37434**
**(consolidated for purpose of opinion)**

**JAVIER BENAVIDEZ, JAMES**
**SANTIAGO MAESTAS, ROBERTO**
**ROIBAL, THE SOUTHWEST**
**ORGANIZING PROJECT, THE NEW**
**MEXICO HEALTH EQUITY WORKING**
**GROUP, and THE PAJARITO VILLAGE**
**ASSOCIATION,**

   Petitioners-Petitioners,

v.

**BERNALILLO COUNTY BOARD OF**
**COUNTY COMMISSIONERS; ART DE**
**LA CRUZ; WAYNE JOHNSON; DEBBIE**
**O'MALLEY; MAGGIE HART STEBBINS;**
**and LONNIE TALBERT, Bernalillo County**
**Commissioners; CONSENSUS PLANNING;**
**and WESTERN ALBUQUERQUE LAND**
**HOLDINGS, LLC,**

   Respondents-Respondents.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nancy J. Franchini, District Judge**

and

**MARCIA BEAUREGARD FERNANDEZ**
**and DANIEL RICHARD "RIP" ANDERSON,**

   Plaintiffs-Petitioners,

v.

**BERNALILLO COUNTY BOARD**
**OF COUNTY COMMISSIONERS,**

Defendant-Respondent,

and

**CONSENSUS PLANNING, INC. and
WESTERN ALBUQUERQUE LAND
HOLDINGS, LLC,**

Interested Parties-Respondents.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Nancy J. Franchini, District Judge**

Certiorari Denied, April 16, 2021, No. S-1-SC-38653; Conditional Cross-Petition Denied, April 16, 2021, No. S-1-SC-38653.  Released for Publication August 31, 2021.

New Mexico Environmental Law Center
Douglas Meiklejohn
Eric Jantz
Jaimie Park
Jonathan Block
Santa Fe, NM

for Petitioners (No. A-1-CA-36979)

Yntema Law Firm P.A.
Hessel E. Yntema III
Albuquerque, NM

for Petitioners (No. A-1-CA-37434)

Robles, Rael & Anaya, P.C.
Robert M. White
Daniel J. Grunow
Jordon P. George
Albuquerque, NM

for Respondents Bernalillo County Board of County Commission and Bernalillo County Commissioners

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward R. Ricco (No. A-1-CA-36979)
John P. Salazar
Jocelyn Drennan (No. A-1-CA-37434)
Jenica L. Jacobi

Albuquerque, NM

for Respondents Consensus Planning, Inc. and Western Albuquerque Land Holdings, LLC

**OPINION**

**HANISEE, Chief Judge**.

**{1}**    In this consolidated opinion,[1] we consider the propriety of actions and determinations by the Bernalillo County Board of County Commissioners (the Board)[2] and the district court, respectively, related to development of the proposed Santolina planned community (Santolina) on Albuquerque's west side mesa in Bernalillo County. For the reasons that follow, we affirm.

**BACKGROUND**

**{2}**    These consolidated appeals arise from the Petitioners' collective opposition to Santolina. We first identify the many parties to this litigation and set forth the general factual and procedural background preceding these appeals, reserving further discussion of facts or litigative events when pertinent to our analysis.

**The Parties**

**{3}**    Petitioners in *Benavidez v. Bernalillo County Board of County Commissioners* are: Javier Benavidez, James Santiago Maestas Roberto Roibal, the Southwest Organizing Project, the New Mexico Health Equity Working Group, and the Pajarito Village Association (collectively, the Benavidez Petitioners).[3] Petitioners in *Fernandez v. Bernalillo County Board of County Commissioners* are Marcia Beauregard Fernandez and Daniel Richard "Rip" Anderson, (collectively, the Fernandez Petitioners), who own and reside at their property located east of the proposed location for Santolina. Respondents in both appeals are the Board, Consensus Planning, Inc. (Consensus Planning),[4] and Western Albuquerque Land Holdings, LLC (WALH).[5]

---

1This opinion consolidates two appeals: Case Numbers A-1-CA-36979 and A-1-CA-37434. Case number A-1-CA-36979, itself, consolidates three separate appeals: Case numbers A-1-CA-36979, A-1-CA-37051, and A-1-CA-37060. Because these cases stem from the same underlying proceedings, involve many of the same parties, and raise related—though distinct—issues, we consolidate the cases for decision. *See* Rule 12-317(B) NMRA.

2During litigation underlying these appeals, the Board was comprised of County Commissioners Art De La Cruz, Wayne Johnson, Debbie O'Malley, Maggie Hart-Stebbins, and Lonnie Talbert.

3Collectively, these parties are Petitioners-Appellants in A-1-CA-36979, and Petitioners-Appellees/Cross-Appellants in A-1-CA-37060 and A-1-CA-37051.

4Consensus Planning is an Interested Party-Respondent in A-1-CA-37434 and is a Respondent in A-1-CA-36979.

5WALH is an Interested Party-Respondent in A-1-CA-37434 and is a Respondent in A-1-CA-36979.

**Initial Proceedings**

{4}     In August 2013 Consensus Planning—acting as an agent for WALH, the owners of approximately 13,800 acres of land in western Albuquerque—applied to the Bernalillo County Planning Commission (the Planning Commission) for review of the Santolina master plan and the accompanying zone map amendment regarding that proposed development on WALH's land. The master plan "establishe[d] the big picture vision and overall framework for the [Santolina] community" by identifying and determining specific uses for the proposed development, the development's site attributes, and the standards to be upheld through the development process. The zone map amendment proposed rezoning the land from A-1 Rural Agricultural to Planned Community Zoning. After multiple hearings, the Planning Commission recommended approval of both the master plan and the zone map amendment to the Board.

**The Benavidez Petitioners' Appeal to the Board and the District Court**

{5}     The Benavidez Petitioners first filed an appeal with the Board, challenging the Planning Commission's recommendation that the Board approve the master plan and the zone map amendment. The Board considered and denied that appeal before ultimately approving the master plan and the zone map amendment on June 16, 2015, following a series of public hearings. After the Board approved the master plan and the zone map amendment, the Board considered a draft of the development agreement between Bernalillo County (the County) and WALH, which was negotiated and prepared by a working group comprised of the County staff and WALH for the Board's consideration. The development agreement is a contract between the County and WALH and is intended, among other purposes, to serve as a preliminary agreement describing the parties' responsibilities regarding infrastructure and financing. The Board took public comments on the draft at a public zoning hearing on June 24, 2015. There, the Board reviewed the draft, adopted revisions, and ultimately voted to approve the development agreement.

{6}     Following the Board's approval of the zone map amendment, the master plan, and the development agreement, the Benavidez Petitioners filed a notice of appeal and alternative petition for a writ of certiorari with the district court, challenging the denial of their previous appeal to the Board and appealing the Board's approval of the zone map amendment, the master plan, and the development agreement.

{7}     The Benavidez Petitioners further contended that the Board's approval of the zone map amendment and the master plan should be vacated because an op-ed article written by County Commissioner Art De La Cruz expressed impermissible bias, depriving them of their right to an impartial tribunal during the proceedings before the Board related to the proposed development, in violation of their due process rights. Specifically, the Albuquerque Journal published Commissioner De La Cruz's op-ed on March 23, 2015, two days before the Board's first hearing regarding the Santolina master plan and the zone map amendment. The op-ed began: "It is important for the public to know why I and others support thoughtful, well-planned developments in

Bernalillo County, such as the proposed Santolina development. It is important that the [C]ounty 'get the facts out' and dispel the distortions and misinformation being spread by opponents[.]" The op-ed continued, "Presently, Santolina fits this model as a master-planned residential and commercial development" and Commissioner De La Cruz "consider[ed] Santolina to be appropriate progress for our [C]ounty." The op-ed concluded with Commissioner De La Cruz opining what would become of WALH's property if the Board did not approve the Santolina development, stating that he supported the development of Santolina because he "prefer[red] to more thoughtfully and proactively determine the destiny of [the] County's unavoidable and foreseeable growth."

{8}     On March 24, 2015, the Benavidez Petitioners filed a motion seeking Commissioner De La Cruz's recusal, and in the alternative, disqualification from the Board's proceedings. The Benavidez Petitioners' motion was heard at the first of the Board's hearings regarding the master plan and the zone map amendment, on March 25, 2015. There, Commissioner De La Cruz explained his op-ed stating that he "was thoughtful to avoid specificity related to any zoning issues"; he had "opined . . . specifically about [his] philosophy related to master plans in general"; and he believed he could render future decisions on the matter "objectively."

{9}     The Benavidez Petitioners asserted to the Board that its impending proceedings regarding the master plan and the zone map amendment were quasi-judicial, requiring a non-biased tribunal, and that Commissioner De La Cruz's op-ed demonstrated his bias to a degree that his continued participation would deprive them of due process. Following discussion at the meeting, no commissioner supported disqualification of Commissioner De La Cruz based on his op-ed, although no vote was held regarding the Benavidez Petitioners' motion. At a May 28, 2015, special zoning meeting, the Benavidez Petitioners renewed their motion regarding Commissioner De La Cruz, at which time, the County attorney reminded the Board that they had declined to vote on the Benavidez Petitioners' motion. After hearing relevant testimony regarding the Benavidez Petitioners' motion seeking disqualification of Commissioner De La Cruz, the Board declined again to vote on the motion and proceeded to deny the Benavidez Petitioners' appeal concerning the Board's approval of the master plan and the zone map amendment.

{10}    Between March and June 2015, the Board held public hearings regarding the master plan and the accompanying zone map amendment. Ultimately, at a special meeting on June 16, 2015, the Board approved both the master plan and the zone map amendment by a 3-2 vote under Resolution 2015-42, with Commissioner De La Cruz joining the majority. In pertinent part, the decision approving the master plan provides that the "request for approval of the [master plan] has been submitted in conjunction with a request for a zone change for Planned Communities . . . Zoning [via the zone map amendment]."

{11}    The district court affirmed the Board's approval of the master plan, holding that such was a legislative action. The district court also held, however, that the Board's

consideration and approval of the zone map amendment was a quasi-judicial action requiring an impartial tribunal. Based on that determination, the district court further concluded that as to the zone map amendment, the Board's failure to consider and vote on the Benavidez Petitioners' motion seeking recusal of Commissioner De La Cruz on due process grounds required reversal and remand. The district court dismissed the Benavidez Petitioners' appeal of the Board's approval of the development agreement for lack of ripeness because there had been no final written decision from which to appeal.

**The Benavidez Petitioners' Current Appeal**

**{12}** Utilizing Rule 12-505 NMRA, the Benavidez Petitioners filed a writ of certiorari to this Court, which we granted. The Benavidez Petitioners argue the district court erred by (1) ruling that the Board's proceedings to approve the master plan were legislative and not quasi-judicial, and (2) ruling that it could not review the Board's approval of the development agreement because there was no final written decision from the Board regarding their approval and adoption of the development agreement.

**{13}** Respondents, meanwhile, argue on cross-appeal that (1) the Board's approval and adoption of the zone map amendment was legislative in nature, and, therefore, whatever bias Commissioner De La Cruz may or may not have exhibited in his op-ed is of no due process concern, as legislative actions require fewer procedural protections than quasi-judicial actions; and (2) even if the Board's proceedings to approve the zone map amendment were quasi-judicial, Commissioner De La Cruz's op-ed did not demonstrate impermissible bias and, therefore, the Benavidez Petitioners are not entitled to partial reversal on that ground. The Board argues as well that even if its approval and adoption of the zone map amendment was quasi-judicial, and even if Commissioner De La Cruz's op-ed constituted impermissible bias, it adequately considered the Benavidez Petitioners' due process challenge alleging bias, thus properly resolving that issue.

**The Fernandez Petitioners' Notice to the Board and Appeal to the District Court**

**{14}** Before the Board approved the master plan, zone map amendment, and development agreement, the Fernandez Petitioners submitted a letter to the Board claiming that the development agreement was prepared, negotiated and recommended to the Board in violation of the Open Meetings Act (the OMA), NMSA 1978, §§ 10-15-1 to -4 (1974, as amended through 2013). The Board did not address the Fernandez Petitioners' letter, and after the Board's approval of the master plan and zone map amendment, the Fernandez Petitioners filed their own notice of appeal and complaint with the district court challenging those prior actions by the Board and also alleging that the negotiation and approval of the development agreement violated the OMA. The Fernandez Petitioners sought a declaratory judgment that the development agreement was invalid as a zoning measure. WALH and Consensus Planning moved to dismiss the Fernandez Petitioners' appeal regarding the Board's approval of the zone map amendment on ripeness and standing grounds. Although the district court denied WALH

and Consensus Planning's motion, it nonetheless dismissed—as it had that aspect of the Benavidez Petitioner's appeal to the court—the Fernandez Petitioners' appeal regarding the Board's approval of the development agreement for lack of a final, written order, and dismissed the Fernandez Petitioners' OMA claim for failure to state a claim. The district court also denied the Fernandez Petitioners' motion to reconsider.

**The Fernandez Petitioners' Current Appeal**

{15}    The Fernandez Petitioners raise seven arguments on appeal attacking approval of the development agreement, arguing: (1) the Board's approval of the development agreement was a decision of zoning authority and the development agreement itself constitutes zoning, and specifically, illegal contract zoning; (2) the district court erred in dismissing the Fernandez Petitioners' administrative appeal regarding the development agreement due to the lack of a final, written order; (3) the development agreement was prepared, negotiated, and recommended in violation of the OMA; (4) the development agreement is invalid because it was not recommended or reported by the Planning Commission; (5) the development agreement was negotiated and approved outside of, and contrary to, the applicable authority in effect in 2015; (6) the enactment of the zone map amendment was unlawful because the relevant zoning ordinance required a development agreement as part of the zoning; and (7) the district court's ruling in *Benavidez* reversing the Board's approval of the zone map amendment renders the development agreement invalid.

**DISCUSSION**

**I.      Standard of Review**

{16}    We resolve administrative appeals by employing "the same standard of review used by the district court while also determining whether the district court erred in its review." *Paule v. Santa Fe Cnty. Bd. of Cnty. Comm'rs*, 2005-NMSC-021, ¶ 26, 138 N.M. 82, 117 P.3d 240. Our review is limited to ascertaining "whether the administrative agency acted fraudulently, arbitrarily or capriciously; whether the agency's decision is supported by substantial evidence; or whether the agency acted in accordance with the law." *Id.* When applying this administrative standard of review, we will not substitute our judgment for that of the fact-finder, but we review questions of law de novo. *See Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806.

**II.     The Board's Proceedings Regarding the Master Plan Were Legislative**

{17}    The Benavidez Petitioners appeal the district court's decision affirming the Board's approval of the master plan, contending first that the district court erred in determining that the Board's proceedings regarding the master plan, and subsequent approval thereof, were legislative actions. The controversy about whether the Board's proceedings were legislative or quasi-judicial is central to this appeal given that "[t]he nature of a particular zoning action as either legislative or quasi-judicial is determinative

of the procedures that the zoning authority is required to follow in implementing that action." *Albuquerque Commons P'ship v. City Council of Albuquerque*, 2008-NMSC-025, ¶ 31, 144 N.M. 99, 184 P.3d 411. A proceeding that is quasi-judicial requires "enhanced procedural protections" for affected parties, including a "fair and impartial tribunal[.]" *Id.* ¶¶ 33-34. Whether the Board's proceedings regarding the master plan were legislative or quasi-judicial is a question of law subject to de novo review. *See Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17 (explaining that even in an appeal of an administrative decision, we review questions of law de novo).

**{18}** "Legislative action reflects some public policy relating to matters of a permanent or general character, is not usually restricted to identifiable persons or groups, and is usually prospective." *KOB-TV, L.L.C. v. City of Albuquerque*, 2005-NMCA-049, ¶ 19, 137 N.M. 388, 111 P.3d 708 (internal quotation marks and citation omitted). "On the other hand, quasi-judicial action has been defined as involving a determination of the rights, duties, or obligations of specific individuals on the basis of the application of presently existing legal standards or policy considerations to past or present facts developed at a hearing conducted for the purpose of resolving the particular interests in question." *Id.* ¶ 20 (internal quotation marks and citation omitted). "Generally, legislative actions result in the *formulation* of a general rule of policy, and quasi-judicial actions result in the *application* of a general rule of policy." *Albuquerque Commons P'ship v. City Council of Albuquerque*, 2006-NMCA-143, ¶ 36, 140 N.M. 751, 149 P.3d 67 (emphasis added), *rev'd on other grounds by Albuquerque Commons P'Ship*, 2008-NMSC-025, ¶ 36.

**{19}** The master plan at issue here falls within the broader umbrella of county-wide planning, pursuant to NMSA 1978, Section 3-19-1(D) (1965) (authorizing a municipality to "adopt, amend, extend and carry out a general municipal or master plan which may be referred to as the general or master plan"), and NMSA 1978, Section 4-37-1 (1975) (providing that "[a]ll counties are granted the same powers that are granted municipalities except for those powers that are inconsistent with statutory or constitutional limitations placed on counties").[6] Comprehensive county or municipal master planning is undertaken "with the general purpose of guiding and accomplishing a coordinated, adjusted and harmonious development" of the municipality or county. NMSA 1978, § 3-19-9(A) (1965); *see* NMSA 1978, § 4-57-2(A) (1967) (stating that county planning "shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted and harmonious development of the county which will, in accordance with existing and future needs, best promote health, safety, morals, order, convenience, prosperity or the general welfare as well as efficiency and economy in the process of development"). For this reason, we have recognized that "the [L]egislature has assigned to the master plan the role of guide, enabling municipal [and county]

---

6In 1988 the Board adopted the Albuquerque/Bernalillo County Comprehensive Plan, a master plan governing "the overall densities, character and design of all land uses and development" in the County. Two years later, the Board adopted Planned Communities Criteria, which provides a framework for three levels of review and approval of a planned community before development can proceed—the first of which concerns the approval of a "Level A" Community Area Plan, such as the master plan at issue in this appeal.

planning commissions to use reasonable discretion in applying its provisions to the actual decision-making processes involved in municipal development." *W. Bluff Neighborhood Ass'n v. City of Albuquerque*, 2002-NMCA-075, ¶ 12, 132 N.M. 433, 50 P.3d 182, *overrruled on other grounds by Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 16. Our Supreme Court similarly observed that "[t]he New Mexico [L]egislature intended any master plan adopted by a municipality to be advisory in nature." *Dugger v. City of Santa Fe*, 1992-NMCA-022, ¶ 26, 114 N.M. 47, 834 P.2d 424.

**{20}**   The Santolina master plan bears many similarities to a comprehensive master plan. Notably, the Santolina master plan is a "rank two Area Plan known as a Level A Community Area Plan." For planned communities, the Level A plan guides the preparation of more detailed rank three Sector Development Plans (Level B plans), which in turn determine subsequent subdivision plats and site development plans (Level C plans). *See* Bernalillo County, N.M. Code § 19.5(A)(1)(a), (b) (2020). Respondents note that the Level A master plan provides an "overall development strategy" to guide the development of approximately 13,851 acres over the next forty to fifty years and contemplates land uses applying to upwards of 90,000 people. Structurally then, a Level A plan resembles a city-wide or county-wide master plan in the hierarchy of planning for a planned community and, as the district court noted, the Santolina master plan—like a comprehensive master plan affecting the entire county—reflects broad, prospective applications of public policy regarding county development. *See W. Bluff Neighborhood Ass'n*, 2002-NMCA-075, ¶ 23 (noting that the Albuquerque/Bernalillo County Comprehensive Plan "is the basic long range city [and county] *policy* for the development and conservation of the entire metropolitan area" (emphasis added) (internal quotation marks and citation omitted)).

**{21}**   On appeal, the Benavidez Petitioners, relying on our Supreme Court's decision in *Dick v. City of Portales*, first argue that the Board's proceedings regarding the master plan contained all the hallmarks of a quasi-judicial proceeding. *See* 1994-NMSC-092, ¶ 5, 118 N.M. 541, 883 P.2d 127 ("A local governing body is acting in a quasi-judicial capacity when it is 'required to investigate facts, or ascertain the existence of facts, hold hearings, weigh evidence, and draw conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature.' " (quoting *Black's Law Dictionary* 1245 (6th ed.1990))). The Benavidez Petitioners note that the Board's proceedings regarding the master plan were conducted as hearings and involved presentation of evidence and findings of fact, the hearings were recorded by a court reporter, individuals who spoke at the hearing were sworn as witnesses, and that prior to the hearings, members of the public were told by members of the Board that the Santolina matter could not be discussed because the impending proceedings were quasi-judicial. While the Benavidez Petitioners hope to evaluate the Board's proceedings strictly by the procedures followed by the Board, we rejected a similar argument in *Dugger*, stating the process by which the decision is reached "did not transform it into a quasi-judicial proceeding, even if the process had the appearance of quasi-judicial proceedings." 1992-NMCA-022, ¶ 15.

**{22}** Instead, the question turns on the distinction between a *formulation* versus an *application* of policy. *See Albuquerque Commons P'ship*, 2008-NMSC-025, ¶¶ 22-23 (stating that the focus of the inquiry is on what kind of action is taken and its effect, rather than on what procedures are used). The Benavidez Petitioners argue that the Board's consideration of the rights of individual parties rendered its determination applicational, and thereby quasi-judicial. But mere consideration of such rights does not alone transmute a proceeding into one that must be characterized as quasi-judicial when that proceeding involves policy decisions that are not legally binding, as here. "We recognize that a legislative decision may appear adjudicatory when parties focus on the effect of the particular decision on individual rights. However, policy decisions generally *begin with* the consideration and balancing of individual rights." *KOB-TV, L.L.C.*, 2005-NMCA-049, ¶ 22 (emphasis added) (internal quotation marks and citation omitted). But, as discussed above—and as recognized by the district court—the master plan at issue here reflects a broad, area-wide policy regarding future development of a large-scale planned community, and despite the fact that the land is owned by a single holder, the character of the action remains legislative. *See Miles v. Bd. of Cnty. Comm'rs*, 1998-NMCA-118, ¶ 12, 125 N.M. 608, 964 P.2d 169 (holding that the county was acting in its legislative capacity when it enacted a comprehensive zoning plan, saying, "the adoption of this comprehensive zoning ordinance . . . was of a character that is commonly described as a legislative act—a policy decision affecting a large number of persons and a vast area of land, based upon general criteria and not the details of any particular land owner"); *see also KOB-TV, L.L.C.*, 2005-NMCA-049, ¶ 19 (stating that legislative action "reflects some public policy relating to matters of a permanent or general character, is not usually restricted to identifiable persons or groups, and is usually prospective" (internal quotation marks and citation omitted)); *Dugger*, 1992-NMCA-022, ¶¶ 26-27 (clarifying that planning documents addressing policy, such as a developmental master plan, are typically adopted by resolution—as was the master plan in this case—and do "not carry the weight of law, as do ordinances" because "a resolution, generally speaking, is simply an expression of opinion or mind or policy concerning some particular item of business coming within the legislative body's official cognizance, ordinarily ministerial in character and relating to the administrative business of the municipality" (internal quotation marks and citation omitted)).

**{23}** The Benavidez Petitioners next argue that the Board "purported to evaluate" the master plan pursuant to existing standards, rendering its proceedings quasi-judicial and not legislative. They rely on *Albuquerque Commons Partnership*, 2008-NMSC-025, ¶ 32, for the proposition that proceedings are quasi-judicial when they entail a "determination of the rights, duties, or obligations of specific individuals *on the basis of the application of currently existing legal standards*." (Emphasis added.) But *Albuquerque Commons Partnership* dealt specifically with the City of Albuquerque's adoption of a new sector plan, which—while not specifically referred to as a zoning decision—did, in effect, rezone a particular property to a more restrictive use. 2008-NMSC-025, ¶¶ 1-2, 50. Thus, the Court concluded that quasi-judicial proceedings were required to protect the affected property owner's due process rights. *Id.* ¶¶ 49, 52. Here, on the other hand, the master plan does not, itself, rezone property in a way that limits or restricts use; rather, the master plan sets forth advisory policy regarding the

development and use of Santolina. The Benavidez Petitioners reiterate that because the Board's proceedings regarding the master plan *resembled* quasi-judicial proceedings, the Board's proceedings must necessarily *be* quasi-judicial proceedings. We disagree, given that "[t]he process by which [a governing body] reache[s] its decision [does] not transform it into a quasi-judicial proceeding, even if the process had the appearance of quasi-judicial proceedings." *Dugger*, 1992-NMCA-022, ¶ 15.

**{24}** For these reasons, and entirely consistent with New Mexico precedent, we hold that the district court correctly determined that the Board's proceedings regarding the master plan were legislative. As such, the district court did not apply an improper standard in evaluating the Benavidez Petitioners' challenges to the Board's approval of the master plan. Given the absence of further challenge on appeal to the district court's affirmance of the Board in this regard, we affirm the district court.

### III. The Board's Proceedings Regarding the Zone Map Amendment Were Quasi-Judicial

**{25}** Respondents each argue that the district court erred in (1) ruling that the Board's proceedings regarding the zone map amendment were quasi-judicial and (2) remanding the issue to the Board for further proceedings because the original proceedings violated the Benavidez Petitioners' due process rights. Whether approval of the zone map amendment was a legislative or quasi-judicial act is a question of law subject to de novo review. *See Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17.

**{26}** "Zoning decisions can be either legislative or quasi-judicial depending upon the impact of the zoning change." *Hart v. City of Albuquerque*, 1999-NMCA-043, ¶ 13, 126 N.M. 753, 975 P.2d 366. We have said that "legislative actions generally reflect public policy in relation to matters of a general nature, as when a determination is made regarding the zoning of a community or area without consideration to any particular piece of property." *W. Old Town Neighborhood Ass'n v. City of Albuquerque*, 1996-NMCA-107, ¶ 11, 122 N.M. 495, 927 P.2d 529, *superseded by statute as stated in Albuquerque Commons P'ship*, 2008-NMSC-025. In contrast, "[w]hen a zoning action is specifically designed to affect a relatively small number of properties and does not apply to similarly situated properties in the surrounding area or city-wide, that action is quasi-judicial, not legislative." *Albuquerque Commons P'ship*, 2008-NMSC-025, ¶ 39; *Los Chavez Cmty. Ass'n v. Valencia Cnty.*, 2012-NMCA-044, ¶ 19, 277 P.3d 475 ("[T]hose who sit on boards adjudicating *individual* property applications for changes in zoning designations act in a quasi-judicial capacity." (emphasis added)).

**{27}** WALH and Consensus Planning argue that the master plan and the zone map amendment were "related parts of an integrated process to define and implement the County Commission's policy choices favoring long-term, planned development" in the area proposed for Santolina's development, and that the Board's proceedings regarding both the master plan and the zone map amendment were legislative. Similarly, the Board argues that "the broad policy decisions reflected in the approval of the . . . [m]aster [p]lan and the adoption of the accompanying [zone map amendment] were the

result of the County's long-term planning process setting growth and development priorities for all future property owners in the planned community of Santolina." We disagree.

**{28}**    To reiterate: unlike legislative action, which "reflects public policy relating to matters of a permanent or general character, is not usually restricted to identifiable persons or groups, and is usually prospective[,]" quasi-judicial action "generally involves a determination of the rights, duties, or obligations of specific individuals on the basis of the application of currently existing legal standards or policy considerations of past or present facts developed at a hearing conducted for the purpose of resolving the particular interest in question." *Albuquerque Commons P'ship*, 2008-NMSC-025, ¶ 32 (internal quotation marks and citation omitted). This is why, in *Albuquerque Commons Partnership*, our Supreme Court concluded that rezoning consequences of a sector determination by the City Council that downzoned a number of included properties—limiting their use from that previously available to prior owners—was quasi-judicial, clarifying that "[w]hen a zoning action is *specifically designed* to affect a relatively small number of properties *and* does not apply to similarly situated properties in the surrounding area or city-wide, that action is quasi-judicial, not legislative." *Id.* ¶¶ 32, 39; *see Dugger*, 1992-NMCA-022, ¶ 9 ("In New Mexico, decisions that determine how a particular piece of property can be used have been held to be quasi-judicial.").

**{29}**    As the district court noted, the zone map amendment "request was made . . . to amend the zone map for a specific area of land, albeit a very large area, . . . in the County. This is not a case where the Board issued a zoning ordinance or zoning action that applied to the entire County." While the affected area may be large in this case, it is nonetheless a specific area and not, for example, all of Bernalillo County or even all of the west side of Albuquerque. This is significant considering we have held that actions approving a city-wide zoning change were legislative, whereas zoning changes addressing smaller or specific areas were deemed quasi-judicial. *Compare KOB-TV, L.L.C.*, 2005-NMCA-049, ¶ 23 (concluding that enactment of a city-wide amendment to the zoning code was a legislative action, not a quasi-judicial action), *and Miles*, 1998-NMCA-118, ¶ 12 (concluding that adoption of comprehensive zoning ordinance affecting entire county served a legislative, not quasi-judicial, function), *with W. Old Town Neighborhood Ass'n*, 1996-NMCA-107, ¶ 11 (holding that the challenged zoning action was quasi-judicial because it was intended to apply only to a single property and, "[i]n New Mexico, zoning decisions involving the application of a general rule to a specific property are not legislative acts; rather they are deemed to be quasi-judicial in nature"). Thus, because the zone map amendment affects only a specific area of identifiable property—and alters that property's zoning in a manner distinct from surrounding properties and the County at large—we consider this case to be more like *Albuquerque Commons Partnership* and less like *Miles*. We hold that the district court correctly determined that the Board's proceedings regarding the zone map amendment were quasi-judicial.

## IV.    The District Court Did Not Err in Reversing and Remanding Issues Related to the Zone Map Amendment

**{30}** Respondents argue that even if, as we have concluded above, the Board's proceedings regarding the zone map amendment were quasi-judicial, the district court erred in determining the Benavidez Petitioners are entitled to reversal of the Board's approval of the zone map amendment because (1) Commissioner De La Cruz's op-ed did not constitute impermissible bias and; (2) even if the op-ed did constitute impermissible bias, the Board adequately considered the Benavidez Petitioners' due process challenge alleging bias, thus resolving that issue. To address these arguments, we consider: (1) whether Commissioner De La Cruz's op-ed expressed bias—or at a minimum gave rise to an impermissible appearance of impropriety—and transformed the Board into a partial tribunal, which is a question of law, *see Siesta Hills Neighborhood Ass'n v. City of Albuquerque*, 1998-NMCA-028, ¶¶ 6, 20, 124 N.M. 670, 954 P.2d 102; and (2) whether the Board adequately considered and voted on the Benavidez Petitioners' due process challenge, which is a question of "whether the district court erred in its review" of the proceedings below. *Paule*, 2005-NMSC-021, ¶ 26 (stating that "[i]n administrative appeals, we review the administrative decision under the same standard of review used by the district court while also determining whether the district court erred in its review").

**{31}** "Quasi-judicial has been defined as: [a] term applied to the action, discretion, etc., of public administrative officers or bodies, who are required to investigate facts, or ascertain the existence of facts, hold hearings, and draw conclusions from them, as a basis for their official action, and *to exercise discretion of a judicial nature*." *Dugger*, 1992-NMCA-022, ¶ 6 (internal quotation marks and citation omitted). Thus, "[q]uasi-judicial zoning matters are not politics-as-usual as far as the municipal governing body is concerned. In such proceedings, the council does not sit as a mini-legislature, as it functions in most matters, but instead must act like a judicial body bound by ethical standards comparable to those that govern a court in performing the same function." *Albuquerque Commons P'ship*, 2008-NMSC-025, ¶ 33 (internal quotation marks and citation omitted).

**{32}** A quasi-judicial proceeding "carries with it important procedural consequences," including due process protections "requir[ing] a fair and impartial hearing before a trier of fact who is disinterested and free from any form of bias or predisposition regarding the outcome of the case." *Los Chavez Cmty. Ass'n*, 2012-NMCA-044, ¶ 20 (internal quotation marks and citation omitted). "[I]nterested parties in a quasi-judicial zoning matter are entitled to an opportunity to be heard, to an opportunity to present and rebut evidence, to a tribunal which is impartial in the matter—i.e., having had no pre-hearing or ex parte contacts concerning the question at issue—and to a record made and adequate findings executed." *Albuquerque Commons P'ship*, 2008-NMSC-025, ¶ 34 (internal quotation marks and citation omitted).

**{33}** In considering whether Commissioner De La Cruz's op-ed expressed bias, we have said that city and county officials alike "must avoid acting or voting on matters wherein they have a conflict of interest or their actions give rise to an appearance of impropriety[.]" *Siesta Hills Neighborhood Ass'n*, 1998-NMCA-028, ¶ 20. While we have recognized that city or county officials "are not expected to be so insulated from their

community as to require them to be detached from all issues coming before them[,]" we have also held that where a city or county has "prejudged the merits" of a particular matter, such prejudgment "give[s] rise to an appearance of impropriety[.]" *Los Chavez Cmty. Ass'n*, 2012-NMCA-044, ¶ 25 (internal quotation marks and citation omitted). It is this latter proposition we must explore here. Because where a due process violation claim is based on alleged bias on the part of the fact-finder, as here, "[t]he inquiry is not whether the [fact-finders] are actually biased or prejudiced, but whether, in the natural course of events, there is an indication of a possible temptation to an average [person] sitting as a judge to try the case with bias for or against any issue presented[.]" *Reid v. N.M. Bd. of Exam'rs in Optometry*, 1979-NMSC-005, ¶ 7, 92 N.M. 414, 589 P.2d 198.

**{34}** Here, Commissioner De La Cruz was tasked with impartially sitting on the Board, as it was presented with and considered evidence to determine whether the zone map amendment ought to be approved or disapproved. Yet, just before the hearing he published his belief that Santolina was a "thoughtful, well-planned development[]" representing "appropriate progress" for Bernalillo County. Such prior statements by the fact-finder "indicating . . . prejudgment of the issues" are a basis for disqualification, and failure to disqualify under such circumstances may violate a person's right to due process. *Id.* ¶ 9.

**{35}** However, "[o]ne should not infer from [our precedent] that a member of a tribunal is necessarily disqualified whenever prior conduct of the member indicates a view that would favor one party or the other." *Las Cruces Pro. Fire Fighters v. City of Las Cruces*, 1997-NMCA-031, ¶ 23, 123 N.M. 239, 938 P.2d 1384. To the contrary, we have recognized that "[m]embers of tribunals are entitled to hold views on policy, even strong views, and even views that are pertinent to the case before the tribunal." *Id.* ¶ 29. "[I]ndeed, they may well have been selected for their offices in part on th[e] basis [of their histories or opinions]." *Id.* ¶ 26. "Recognition of this reality counsels us against requiring that every decisionmaker start with a clean slate." *Id.* Accordingly, an official is not required to recuse himself simply because he has previously expressed support for a particular policy. *Id.* Rather, a statement or position is generally disqualifying only if it concerns the *specific* proposal or action that is before the tribunal. *See Carangelo v. Albuquerque-Bernalillo Cnty. Water Util. Auth.*, 2014-NMCA-032, ¶ 70, 320 P.3d 492 ("Regardless of whether an official is actually biased, he [or she] appears biased when he [or she] expresses prejudgment of an issue in a pending case and will, therefore, need to recuse himself [or herself] in most instances.").

**{36}** Here, Commissioner De La Cruz's op-ed announced and explained his support, generally and specifically, for the matter under consideration by the Board on which he served—Santolina and its future development. His comments were published just two days prior to hearings which culminated in the Board's approval of the zone map amendment by a 3-2 vote, with Commissioner De La Cruz in the majority. In the op-ed, Commissioner De La Cruz stated that he thought it was "important for the public to know why [he] support[ed] thoughtful, well-planned developments in Bernalillo County, such as . . . Santolina[.]" Commissioner De La Cruz continued, stating that "[b]ecause growth is inevitable, . . . Santolina [is] appropriate progress for [Bernalillo C]ounty." As

well, Commissioner De La Cruz opined, "[b]y potentially denying Santolina or other [developments] like it, we send the message that new residents are not welcome here." Commissioner De La Cruz went so far as to characterize opponents of Santolina as "spreading fear" throughout Albuquerque's South Valley and warned that "[s]hould the [C]ounty deny approval of . . . Santolina . . ., there is nothing to prevent the owner from selling the land in small parcels to multiple individual owners . . . [creating] a vast quiltwork of ununified projects at best[,]" an outcome that he would rather avoid.

**{37}** This Court has previously resolved, in a recent unpublished opinion, the issue of alleged bias from statements of a county commissioner. *See Nichols v. Bd. of Cnty. Comm'rs of Taos Cnty.*, No. A-1-CA-36002, mem. op. ¶ 13 (N.M. Ct. App. Dec. 31, 2018) (non-precedential). In *Nichols*, the Taos County Board of Commissioners considered and approved an administrative permit for improvements to the Taos Regional Airport. *Id.* ¶ 1. In response, the *Nichols'* petitioners appealed to the board and, subsequently, to the district court, claiming that statements made by two county commissioners during the administrative proceedings leading to the permit approval constituted impermissible bias, thus violating the petitioners' due process rights to an impartial tribunal. *Id.* ¶¶ 11, 13. One of the commissioner's statements in *Nichols* appeared in an op-ed, published fifteen months prior to the relevant board hearings, in which the commissioner expressed support for expansion of the airport. *Id.* ¶ 13. The second commissioner's statement, previously published on social media during the commissioner's campaign for election to the board, "applauded" efforts to expand the airport and referred to such expansion as "a plus from a public safety point of view." *Id.* (internal quotation marks omitted).

**{38}** In *Nichols*, this Court concluded that the commissioners' statements were not made in reference to the specific proposal being considered by the county commission—the proposed administrative permit for airport-related improvements—but were statements of general public policy positions offering "generic, out-of-context prior statements of support for airport expansion." *Id.* ¶¶ 13-14. As such, we held that the district court correctly concluded that the petitioners' due process rights were not violated by the commissioners' past statements and subsequent, later participation in board proceedings. *Id.* ¶¶ 1, 15-16. Here, in contrast to *Nichols*, Commissioner De La Cruz's op-ed was published immediately before the Board's first hearing regarding the master plan, and, most critically, the zone map amendment.

**{39}** We view our precedent on this topic to reflect the balance between two priorities: (1) openness and clarity on the part of elected officials regarding matters of importance to the community they serve, which permits general statements of support for topics related to the performance of official responsibilities, and (2) the need for such officials to refrain from prejudging specific cases or proposals. While a commissioner's "prejudgment or point of view about a question of law or policy, even if so tenaciously held as to suggest a closed mind, is not, *without more*, a disqualification[,]" *Las Cruces Pro. Firefighters*, 1997-NMCA-031, ¶ 24 (emphasis added) (internal quotation marks and citation omitted), where, as here, a commissioner's statements concern the very proposal or action pending review before the commission, such a statement may be

disqualifying. *See id.* ¶ 12; *Carangelo*, 2014-NMCA-032, ¶ 70. Moreover, when a commissioner's statements are made in close temporal proximity to the relevant hearing and specifically criticize the perspective of opponents of the proposal, the case for finding them disqualifying is strengthened. This is particularly so because there can be little doubt that the statements were not based on evidence adduced at the not-yet-held hearings but rather on information from some other source. *Cf. Albuquerque Bernalillo Cnty. Water Util. Auth. v. NMPRC*, 2010-NMSC-013, ¶ 45, 148 N.M. 21, 229 P.3d 494 (explaining that it is not error for a commissioner to decline to recuse themselves where the commissioner's statements are based on evidence adduced from within relevant proceedings rather than "on information obtained outside the course of the proceedings" (omission, internal quotation marks, and citation omitted)).

**{40}** As such, and under our administrative standard of review wherein we refrain from substituting our judgment for the district court as fact-finder, we cannot conclude that the district court erred in finding that Commissioner De La Cruz's op-ed "raise[d] questions of partiality and prejudgment, or the appearance thereof, sufficient to warrant"—and require—the Board's consideration of the Benavidez Petitioners' motion requesting Commissioner De La Cruz's recusal. In addition, review of the record indicates that the Board did not adequately consider the substance of the Benavidez Petitioners' due process challenge; instead, they merely concluded that they would not review that aspect of the matter further and proceeded to deny the Benavidez Petitioners' appeal. We hold, therefore, that the district court did not err in reversing the Board's approval of the zone map amendment, and in ultimately remanding consideration of the zone map amendment's approval to the Board for further proceedings.

**{41}** We take this moment to clarify that on remand, the tasks before the current Board are (1) to again hear the Benavidez Petitioners' appeal of the Planning Commission's recommendation that the Board approve the zone map amendment, and (2) to ensure, as directed by the district court, that current Board members have "assure[d] themselves and their constituents that they are free of conflicts of interest and without partiality or prejudgment in the matter." We note that the (current) Board need not determine whether Commissioner De La Cruz's op-ed did or did not express impermissible bias given Commissioner De La Cruz no longer serves on the Board and will therefore not participate in proceedings on remand.

## V. The Development Agreement Does Not Constitute Zoning and the Board's Approval of the Development Agreement Was Not a Zoning Decision

**{42}** On appeal, the Fernandez Petitioners argue that the development agreement—though undisputedly a contract between WALH, Consensus Planning, and the Board—constitutes zoning and the approval thereof was an invalid zoning decision. This presents a question of law we review de novo. *Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17.

**{43}** The purpose of the development agreement is to

[(1)] codify the [m]aster [p]lan and the [l]and [u]se [p]lan, . . . [(2)] outline a preliminary infrastructure/service agreement to cover phasing of the [m]aster [p]lan, . . . [(3)] commit to mitigation of negative consequences of development when known, [(4)] provide an assignable agreement under mutually agreeable terms which will be permanent unless renegotiated, [(5)] provide a document suitable for recording, and [(6)] identify incentives to be provided by the County to [WALH].

The development agreement states that its effect "is contingent upon action by the [g]overning [b]ody approving the [m]aster [p]lan, the [l]and [u]se [p]lan," the zone map amendment, and the development agreement, itself. The development agreement includes many recognizable features of a contract, including a provision specifying that WALH would be responsible for mitigating negative impacts resulting from development, an explanation of the parties' rights, and a provision specifying that the development agreement is assignable. As well, the development agreement includes provisions allocating responsibility for various infrastructure, such as roadways, industrial development, storm water drainage, water and sewer and open space, parks, recreation, and trail facilities. The development agreement does not include, however, any language that indicates it is a contract that zones or rezones any property.

**{44}** The Fernandez Petitioners contend otherwise because: (1) the development agreement was discussed and approved at a public zoning hearing; (2) the Board was acting as a "zoning authority" during the public meetings and hearings related to Santolina; and (3) the development agreement was enacted under zoning and planning authority. We are unpersuaded. Rather, it is undisputed that the development agreement is a contract between WALH, Consensus Planning, and the Board. As the district court pointed out, within that contract the Fernandez Petitioners identified no language that expressly or impliedly compels changes to zoning. The Fernandez Petitioners cite to multiple inapposite cases to support their contentions, but none involve the approval of a contract between parties, like the development agreement. Rather, the cited cases involve the adoption of an ordinance requiring special use permits, the adoption of a development plan *which included zoning restrictions* related to the approval of covenants, the approval of a settlement agreement, and the approval of restrictive covenants.[7] The Fernandez Petitioners present no other authority to support their contentions, and as such we may assume no on point authority exists. *See*

---

[7]See *Bd. of Cnty. Comm'rs of San Miguel Cnty. v. City of Las Vegas*, 1980-NMSC-137, ¶¶ 1, 12, 95 N.M. 387, 622 P.2d 695 (holding that the adoption of an ordinance authorizing the board of county commissioners to require special use permits for the use of landfills was a zoning decision because "zoning is defined as governmental regulation of the uses of land and buildings according to districts or zones" (internal quotation marks and citation omitted)); *Nesbit v. City of Albuquerque*, 1977-NMSC-107, ¶ 5, 91 N.M. 455, 575 P.2d 1340 (holding that a development *plan* restricting the use of land such that it "can be used for no other purpose" constitutes zoning); *Lewis v. City of Santa Fe*, 2005-NMCA-032, ¶ 3, 137 N.M. 152, 108 P.3d 558 (holding that the city council's approval of a settlement agreement in which the city agreed to approve the construction of a gas station was a zoning decision); *Vill. of Los Ranchos de Albuquerque v. Shiveley*, 1989-NMCA-095, ¶¶ 7, 21, 23, 110 N.M. 15, 791 P.2d 466 (holding that covenants required and recorded with an approved plat are in effect a rezoning because such covenants "embody a rezoning of the area within the subdivision").

*Curry v. Great Nw. Ins. Co.*, 2014-NMCA-031, ¶ 28, 320 P.3d 482 ("Where a party cites no authority to support an argument, we may assume no such authority exists."). Finally, the Fernandez Petitioners' arguments that the development agreement constituted illegal contract zoning and should have been first approved by the Planning Commission rest solely on their initial contention that the development agreement constituted zoning. Because we agree with the district court that it did not, it follows that those latter claims fail.

## VI. The Lack of Either a Final, Written Order or a Statutory Right of Appeal Precluded the District Court's Review of the Board's Approval of the Development Agreement

**{45}** The Fernandez Petitioners appeal from the district court's amended order ruling that the Board's approval of the development agreement was not appealable because there was no final, written order from the Board regarding that action. The Fernandez Petitioners argue the district court's dismissal of their administrative appeal on such basis was error. The underlying issue is whether—considering the lack of a final, written order—the district court had jurisdiction to review the Fernandez Petitioners' administrative appeal, and such is a question we review de novo. *See Smith v. City of Santa Fe*, 2007-NMSC-055, ¶ 10, 142 N.M. 786, 171 P.3d 300 ("[T]he question of whether a trial court has jurisdiction in a particular case is a question of law that we review de novo[.]"); *Rio Grande Chapter of Sierra Club*, 2003-NMSC-005, ¶ 17.

**{46}** Both the Benavidez Petitioners and the Fernandez Petitioners sought to appeal the Board's decision to approve the development agreement to the district court under Rule 1-074 NMRA. In order to pursue such an appeal, however, there must be a statutory right of appeal to the district court. *See* Rule 1-074(A), (B). The Fernandez Petitioners argue that such a statutory right is found in NMSA 1978 Section 3-21-9 (1999), NMSA 1978, Section 3-19-8 (1999), and NMSA 1978, Section 39-3-1.1 (1999). However, the statutory right to an appeal under Section 3-21-9 exists *only* when the appealed decision involves zoning or a planning decision. *See id.* ("A person aggrieved by a decision of the zoning authority or any officer, department, board or bureau of the zoning authority may appeal the decision pursuant to the provisions of Section 39-3-1.1[.]"). Having concluded above that the development agreement does involve zoning and the approval thereof was not a zoning decision, we agree with the district court that the Fernandez Petitioners did not have a statutory right of appeal under Rule 1-074 and, therefore, the Fernandez Petitioners' administrative appeal was properly dismissed.

**{47}** As such, and consistent with the district court's decisions in both cases, we hold that the district court properly dismissed Petitioners' administrative appeals, recognizing that we do so relying on a different basis than that of the district court. *See Lynn Hawkins v. McDonald's*, 2014-NMCA-048, ¶ 23, 323 P.3d 932 ("Under the right for any reason doctrine, we may affirm the district court's order on grounds not relied upon by the district court if those grounds do not require us to look beyond the factual allegations that were raised and considered below." (internal quotation marks and citation omitted)).

**VII. The District Court Properly Dismissed the Fernandez Petitioners' Claim Regarding a Violation of the Open Meetings Act**

**{48}** The Fernandez Petitioners argue the district court erred in dismissing their OMA action for failure to state a claim, arguing that we should instead award summary judgment in their favor on those claims. We review this issue de novo. *See Schmidt v. Tavenner's Towing & Recovery, LLC*, 2019-NMCA-050, ¶ 4, 448 P.3d 605 ("A district court's decision to dismiss a case for failure to state a claim under Rule 1-012(B)(6) [NMRA] is reviewed de novo." (internal quotation marks and citation omitted)); *Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17.

**{49}** "The purpose of [the OMA] is to open the conduct of the business of government to the scrutiny of the public and to ban decision-making in secret." *Kleinberg v. Bd. of Educ. of Albuquerque Pub. Sch.*, 1988-NMCA-014, ¶ 18, 107 N.M. 38, 751 P.2d 722 (internal quotation marks and citation omitted). Under the OMA, "the public policy of [the state] is that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of those officers and employees who represent them." *N.M. State Inv. Council v. Weinstein*, 2016-NMCA-069, ¶ 73, 382 P.3d 923 (alterations, internal quotation marks, and citation omitted). In pertinent part, the OMA provides:

> All meetings of a quorum of members of any board, commission, administrative adjudicatory body or other policy[-]making body of any state agency . . ., held for the purpose of formulating public policy, . . . discussing public business or taking any action within the authority of or the delegated authority of any board, commission or other policymaking body are declared to be public meetings open to the public at all times, except as otherwise provided in the constitution of New Mexico or the [OMA].

NMSA 1978, § 10-15-1(B) (2013). "Procedural defects in compliance with the OMA may be cured by taking prompt corrective action." *Weinstein*, 2016-NMCA-069, ¶ 86 (alterations, internal quotation marks, and citation omitted).

**{50}** The Fernandez Petitioners claim the development agreement was negotiated and approved in violation of the OMA, contending that: (1) the development agreement establishes County policy for Santolina; (2) the Board impermissibly delegated its authority to the Bernalillo County Manager's Office to negotiate the development agreement; (3) the County Manager's Officer conducted closed meetings with County staff members, WALH, and Consensus Planning to negotiate the development agreement prior to its review by the Board; (4) the County Manager's Office, functioning on behalf of the Board, was a policy-making body for the negotiation of the development agreement; (5) the meetings in which the development agreement was negotiated prior to its review by the Board were subject to the OMA; and (6) such negotiation meetings did not comply with the OMA.

**{51}** To resolve the Fernandez Petitioners' claims, we first address whether the development agreement's negotiation and approval process was subject to the OMA. In considering whether an entity or proceeding is subject to OMA, "it is the nature of the act performed by the committee, not its makeup or proximity to the final decision, which determines whether an advisory committee [or other comparable entity] is subject to open meetings statutes." *Id.* ¶ 75 (internal quotation marks and citation omitted). A non-statutory committee, like the working group comprised of Bernalillo County staff and WALH in this case, "may constitute a policy-making body subject to the OMA if it makes any decisions on behalf of, formulates recommendations that are binding in any legal or practical way on, or otherwise establishes policy for the public body. A public body may not evade its obligations under the OMA by delegating its responsibilities for making decisions and taking final action to a committee." *Id.* (alterations, internal quotation marks, and citation omitted).

**{52}** Here, the Fernandez Petitioners argue that the Board impermissibly delegated its authority to the Bernalillo County Manager's Office and the working group to negotiate the development agreement in violation of the OMA. In *Weinstein*, we considered the question of whether the New Mexico State Investment Council (NMSIC) and its litigation committee complied with the OMA in negotiating settlements under the Fraud Against Taxpayers Act. *Id.* ¶ 2. There, this Court concluded that the litigation committee was subject to the OMA because it was "intended to be a policy-making body and its meetings were for the purpose of taking an action within the authority of NMSIC . . . which is unquestionably subject to the OMA[.]" *Id.* ¶ 75 (alteration omitted). We further concluded that NMSIC's "attempt[ ] to delegate its authority to take action on the settlements to the [litigation c]ommittee" was in direct contravention of "the OMA's purpose to permit a public body to avoid the OMA's requirements simply by delegation its responsibilities to a smaller body." *Id.*

**{53}** In contrast to the litigation committee in *Weinstein*, the working group here had no authority to act in a way that could bind the Board to any action or decision it negotiated or developed, including the development agreement. Rather, the working group drafted the development agreement in order for it to be handed off to the Board, and it was subsequently the Board—not the working group—that heard public comments on the draft and adopted revisions prior to its vote to approve the development agreement. The working group was not delegated the responsibility of taking action under the authority of the Board as the litigation committee was in *Weinstein*. Instead, the working group here merely functioned as the initial drafters of the development agreement rather than a policy-making body intended to act with the authority of the Board. For these reasons, we conclude the development agreement's creation, development, and negotiation process conducted by the working group was not subject to the OMA and, therefore, no violation of the OMA occurred. Accordingly, we affirm the district court's dismissal of the Fernandez Petitioners' OMA claim.

**VIII. Enactment of the Zone Map Amendment Did Not Require the Development Agreement to be Simultaneously Approved and Our Remand of the Zone Map Amendment Does Not Render the Development Agreement Invalid**

**{54}** Incorporating their above arguments regarding the development agreement, the Fernandez Petitioners argue that the enactment of the zone map amendment was unlawful because the relevant zoning ordinance required a development agreement as part of the zone map amendment. As the district court made clear, the Fernandez Petitioners are correct that the Board had neither considered nor entered into the development agreement at the time it adopted the zone map amendment. The Board enacted the zone map amendment on June 16, 2015, and approved the final version of the development agreement on June 24, 2015. The Fernandez Petitioners cite no authority to support the proposition that the Board was required to consider the development agreement *simultaneously* to its review and approval of the zone map amendment, and as such we assume no such authority exists. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329. We reiterate the district court's finding that nothing in the zoning code required the Board to enter the development agreement before or simultaneously with the zone map amendment, and agree that, as such, the Board's consideration of the development agreement was timely. *See* Bernalillo County, N.M., Code § 19.5(A)(2). Under our administrative standard of review, we cannot conclude the district court erred in making such findings, and thus we affirm. *See Paule*, 2005-NMSC-021, ¶ 26.

**{55}** The Fernandez Petitioners also argue that reversal of the zone map amendment renders the development agreement invalid. Although Section 3.3 of the development agreement states that it "is contingent upon action by the [g]overning [b]ody approving the [m]aster [p]lan, the [l]and [u]se [p]lan, [the zone map amendment, and this development a]greement," we do not interpret this language to state that approval of the zone map amendment was a condition precedent to the validity of the development agreement, and the Fernandez Petitioners have failed to develop an argument on this point. *See W. Com. Bank v. Gillespie*, 1989-NMSC-046, ¶ 4, 108 N.M. 535, 775 P.2d 737 ("Generally, a condition precedent is an event occurring subsequently to the formation of a valid contract, an event that must occur before there is a right to an immediate performance, before there is breach of a contractual duty, and before the usual judicial remedies are available. Whether conditions precedent are considered prerequisites to formation of a contract or prerequisites to an obligation to perform under an existing agreement is controlled by the intent of the parties." (citation omitted)); *see also Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them."). The Fernandez Petitioners have not established that the development agreement is rendered invalid by virtue of our remand on the zoning issue and we, therefore, hold that the development agreement is valid, its enforceability and function pending future approval of the zone map amendment by the Board.

**CONCLUSION**

**{56}** For the above reasons, we affirm the district court's rulings in both cases and remand the zone map amendment to the Board with instructions that it make

determinations, in a manner consistent with this opinion, of whether the zone map amendment shall be approved.

**{57}   IT IS SO ORDERED.**

**J. MILES HANISEE, Chief Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**MICHAEL D. BUSTAMANTE, Judge Pro Tempore**